

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In the Matter of the Complaint of Bruce Investment Co., Inc., as the Owner of M/V SUPPLIER, and Gulf Tran, Inc., as the Operator of M/V SUPPLIER, Praying for Exoneration from or Limitation of Liability Pursuant to 46 U.S.C. Section 183 *et seq.* | * * * * * * | CIVIL ACTION<br><br>NUMBER 00-0372<br><br>SECTION S MAG. 2 |

**PRETRIAL MEMORANDUM BY CLAIMANT, TODD BALLARD HINES**

I. Factual Background

In December 1998 a construction crew from Omega Industries, which included claimant Todd Hines, was transported to a platform in Ship Shoal Block 354 in the Gulf of Mexico, to perform work for Allseas Inc. Claimant Exhibit B. The Omega crew could not perform any work after arriving on the platform due to poor weather conditions and sea conditions. Dep. Monty Rivers P12 L25 - P13 L4. On December 24, 1998, the Omega crew was sent to shore by the Allseas representative, Monty Rivers. The M/V SUPPLIER was the standby offshore supply vessel used to transport equipment and personnel to and from Ship Shoal 354 and Port Fourchon, Louisiana, an approximate 8-9 hour one way trip away. Claimant Exhibit B.



The M/V SUPPLIER is an offshore supply vessel (OSV) owned by Bruce Investment, Inc., and operated by Gulf Tran, Inc. Claimant Exhibit C. It is 106.9 feet in length and powered by two engines that propel the vessel a maximum of 10 knots. Claimant Exhibit C; Dep Gulf Tran P16 L2-8. It is certified to carry 16 persons other than the four man crew. Claimants Exhibit C. However, there is not enough bunk space to provide a bunk for all of those people.

The salon area of the M/V SUPPLIER is located on the same level as the main deck and contains a settee/bunk along the starboard side of the salon. The seat bottom of the settee is approximately 6 feet long and 24 ½ inches wide. The seat back is also about 6 feet long but 30 inches wide. The seat back is attached to the settee frame at the top with three hinges that allow the seat back to be lifted up from the side nearest the seat bottom. There are two straps attached to the bottom of the seat back on the side opposite of the hinges. These straps are hooked into two eyelets on the salon ceiling that hold the seat back up when it is pulled up to be used as a bunk. Claimants Exhibit F1 and F3.

At 10:00 AM on December 24, 1998, the M/V SUPPLIER left the platform at Ship Shoal Block 354 heading towards Port Fourchon with 9 passengers and equipment. Claimant Exhibit B(5). These passengers included Mr. Hines and his crew, an x-ray crew and a sandblaster from TNT, Inc.

There is a dispute among the witnesses as to whether or not the Omega crew was ordered to go in or given the option to go in. This fact does not change the circumstances since the M/V SUPPLIER was the only means of getting to shore. The captain was in control of the vessel and had the ultimate decision to accept or reject the passengers. In this case he determined it was safe to carry these passengers to shore.

There is no real dispute that the seas and weather were rough on December 24, 1998. Monty Rivers testified that was the reason the work could not be done. The vessel logs indicated that the wind was from the north at 35 MPH, near Gale force. The skies were cloudy and the seas were 6 to 9 feet in the morning. By the afternoon the seas had risen to 7 to 10 feet. Claimant Exhibit B(5)

After the vessel pulled away from the platform, the Captain left the wheelhouse and left the wheel to the mate, Rene Baxter, who by her own admission was still a little green. Dep Rene Baxter P18 L8-16. The M/V SUPPLIER headed 27 degrees north toward Port Fourchon at a speed of 9.5 knots. Claimant Exhibit A2. With that course the wind and seas struck the vessel on its port quarter side. Those conditions caused the vessel to pitch and roll severely. Expert testimony and common sense will indicate that this almost full throttle speed is not safe under the wind and sea conditions on that date.

Many of the passengers on the vessel attempted to find a place to bunk down for the long ride to port. Some slept in the bunks located in the crew quarters and one person even slept on the washing machine and dryer in the salon area. Dep Rene Baxter P16 L16-19. However, there were not enough regular bunks for everyone. There is disputed testimony that Captain Unrue and Mr. Hines got into an argument because Hines wanted to use a bunk in a crew's quarters. In any event, the settee/bunk was set up and offered by a crew member for Mr. Hines' use.

At 1:15 PM that portion of the settee/bunk that Mr. Hines was lying on separated from the wall at the hinges. Claimant described the event as "I remember feeling like, a feeling of falling and then just hearing a crash and seeing stars and that's about all I remembered.". Claimant recalled the vessel going way up and falling just prior to the fall. He also recalled holding onto the strap on the

edge of the bunk prior to the fall. As Mr. Hines fell, he struck the edge of the bunk below and landed on the floor.

Richard Sonnier, a painter sandblaster for TNT, Inc., was trying to sleep on the settee bottom below Mr. Hines. He was suffering from seasickness and had gone to the bathroom just minutes before the incident. He described the movement of the vessel as follows:

> " Bouncing hard, it was bouncing hard; to get up to use the bathroom you had to watch how you walked because you would fly side to side. It was bouncing so hard. Like your feet would leave the floor."
> Sonnier Dep. Page 15 Line 21 to Page 16 Line 3

He also confirmed that no one from the M/V SUPPLIER gave them any type of safety orientation or any special instructions to follow for the rough weather ride to shore. He testified that a crew member of the vessel was the one that set up the bunk and suggested that it be used as a bunk for the ride to shore.

Mr. Sonnier was just dozing off when he heard the hinges rip out of the wall. He was struck by a falling life jacket and immediately turned and saw Todd Hines on the floor. He looked at the wall and saw the screw holes. It appeared that the screws had pulled out of the wall. The screws stayed in the hinge and were close to his face. Mr. Sonnier described the screws as being wood screws about an inch long.

Eric Picard, an Omega employee, was trying to sleep in a bunkroom adjacent to the salon area. He likewise described the ride as being very rough. The vessel would bounce and roll and made it difficult to walk without holding onto something. He also confirmed that no one with the vessel provided any type of safety orientation or other instructions for the rough ride to shore. He

heard a loud noise which sounded like something struck the floor. He immediately got out of his bunk and went into the salon area where he saw Todd Hines on the floor.

Todd Hines complained that he thought he may have hurt his back. Rene Baxter, the mate that was at the wheel, went to the galley just after the event. She saw Mr. Hines and another passenger sitting in the galley. She was informed of the event and she went to the wheelhouse and instructed the deckhand who was at the wheel to wake Captain Unrue who was asleep in his quarters. An accident report was prepared and the incident was noted in the log.

Plaintiffs allege that the accident did not occur as described by Mr. Hines. They contend that Mr. Hines stood up in the salon, pulled the bed out of the wall, then faked a fall to the floor. The evidence does not corroborate their allegation. Plaintiffs rely on the testimony of Captain Unrue to support its allegations. He opined that Mr. Hines pulled the bed out of the wall based on the fact that he and Mr. Hines had an argument about where Mr. Hines could sleep. He also relied on the configuration of the screws as he saw them after the accident. The problem with Captain Unrue's speculation is that no one else on this vessel heard or were aware of any argument between the Captain and Mr. Hines. The damaging physical evidence allegedly seen by the Captain is no where to be found. In fact it was removed and destroyed by the plaintiffs and was never produced, despite the declaration on the accident report that " IF ANYTHING BROKE , ALL PARTS/PIECES MUST BE PRESERVED". Claimant Exhibit A1. The salon area and the galley right next to the salon had other passengers who would have heard or seen the commotion it would take for someone to try to rip a bed four to five feet off the floor. Plaintiffs also hired an expert to disprove Mr. Hines'

description of the accident. However, their own expert's testimony corroborated rather than disproved Mr. Hines' version of the accident.

Robin Pittman, a deckhand on the M/V SUPPLIER, testified that he was told by another crew member that there was a problem with the settee/bunk. It was his job to keep people from sleeping in that bunk. He testified that he warned the passengers not to use the settee/bunk. This is contradicted by the testimony of Mr. Sonnier and Mr. Picard who both testified that a vessel crew member opened the bunk and offered it to the passengers for their use. They also testified that no one told them not to use the settee bunk or warned them that there was a problem with the settee/bunk.

Ross Bruce is the president of both Bruce Investment Co., Inc., and Gulf Tran, Inc. Bruce Investment is the owner of the M/V SUPPLIER. It has no employees except Mr. Bruce and his wife who is also an officer. Mr. Bruce makes the policy for Gulf Tran. He also makes all of the decisions about the charters for the vessel and supervises the purchases and repairs for the vessel. Gulf Tran does not offer any training for its captains after they are hired. He is not aware of any Coast Guard regulation that required a safety orientation for offshore workers when they board his vessel and he did not require an inspection of the settee/bunks after he purchased the M/V SUPPLIER despite its age. Mr. Bruce had no knowledge of what weight the settee/bunk could safely support. Gulf Tran did not have any company policy about passenger safety during rough seas.

Mr. Bruce had the settee/bunk and its hinges and screws removed from the M/V SUPPLIER in December 1999. He did not preserve these items despite his actual knowledge that a suit was filed against his company in August 1999 complaining that the settee/bunk was defective.

Claimant sought medical treatment at Dauterive Hospital In New Iberia, Louisiana, on December 27, 1999. He complained of back pain and a crick like pain in the neck. Cervical and lumbar x-rays were performed and read as normal. He was told to see his family doctor.

He next saw Dr. John Cobb, an orthopedic surgeon in Lafayette, Louisiana, on January 4, 1999. On February 1, 1999, claimant was admitted to Charter Cypress Hospital in Lafayette for suicidal thoughts, depression, alcohol and drug use and dependance. He stayed there five days and was discharged with a fair prognosis.

Dr. R. Dale Bernauer in Lake Charles, Louisiana, was Mr. Hines' treating orthopedic surgeon. He first saw claimant on March 3, 1999. Dr. Bernauer ordered an MRI of the neck and back and EMG of the right arm and right leg. The MRI of the back showed a herniated disc at L 4-5, and the MRI of the cervical spine showed a herniation at C 5-6 and C 6-7. The EMG indicated L5 nerve root compression and carpal tunnel syndrome. A second opinion was obtained by LWCC, the compensation carrier, and resulted in further conservative treatment.

In May 1999, Mr. Hines had complete myelography of the cervical and lumbar spine. This was followed with cervical and lumbar CT scan with contrast. These tests confirmed a herniated disc at L4-5 and cervical disc problems as noted on the MRI. On August 19, 1999, claimant underwent an anterior lumbar interbody fusion at L4-5.

In November 1999, Mr. Hines was admitted to St. Patrick Hospital in Lake Charles for four days for polysubstance dependence, recurrent depression and mood swings. He attributed his problems to chronic pain from his injuries. He was referred to a psychiatrist, Dr. Charles Murphy, in Lake Charles, Louisiana. Dr. Murphy has continued to see Mr. Hines for medication management

and psychotherapy. Although Mr. Hines had previous episodes of substance abuse, Dr. Murphy attributed his post-accident abuse problems to the stress and chronic pain from the injury in December 1998 and a pre-existing personality disorder.

After the lumbar fusion Mr. Hines continued with neck pain and had an anterior cervical fusion at C5-6 and C5-7 in February 2000. Claimant also saw Dr. Paul Mayes, a physical rehabilitation doctor, in June 2000, on referral by Dr. Bernauer, for pain management. This treatment continued until October 2000, when Dr. Mayes discontinued the relationship due to possible drug abuse by Mr. Hines.

Dr. Bernauer last saw Mr. Hines March 21, 2001. He assessed a 25 percent permanent disability to his lower back and a 25 percent permanent disability to his neck; giving him a 10 percent permanent disability to the body as a whole. As per his functional capacity evaluation done June 12, 2001, Mr. Hines was limited to sedentary type work which means no lifting greater than 10 to 20 pounds; no stooping, squatting, bending, or climbing.

In October 2001, claimant started vocational rehabilitation through the Department of Labor Longshoreman's Division. Monica Salopeck, the rehab counselor, developed a rehabilitation plan that included Mr. Hines attending Sowella Technical College in Lake Charles for computer programming. He enrolled in January 2002 as a full time student but dropped out in March 2002. He had been in an automobile accident that aggravated his prior neck and back injuries. Mr. Hines re-enrolled in the summer of 2002 at his own expense and and successfully completed two classes, English composition and Speech, with an A in each class. He is currently enrolled in the fall semester.

Mr. Hines was a fairly high wage earner despite his pre-existing substance addiction. A review of his social security earnings records indicates an average annual earnings of $35,359 for the five year period before the accident. For the twelve month period prior to the accident he earned $46,956.00. All of this work was manual labor intensive which he cannot now perform. Without retraining Mr. Hines' earning potential is in the $5.15 to $8.00 per hour level. With retraining he could expect to earn $12.00 per hour or approximately $25,000.00 per year. This will still result in a significant wage loss. Since the date of his accident claimant has lost approximately $150,000.00 in after tax dollars. If he successfully completes the program at Sowella Technical College he would experience a net future wage loss of $331,772.00, for a total loss of $483,041.00.

Medical expenses for Mr. Hines treatment was $83,610.47. LWCC has intervened in these proceedings seeking reimbursement of this amount and the $119,098.02 paid in compensation benefits. Claimant opposes this claim based on a blanket waiver of subrogation contained in LWCC's policy of insurance.

II. Applicable Law

"The owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632, 79 S.Ct. 406, 410 (1959). Shipowners are held to a high degree of care to their passengers. Smith v. Southern Gulf Marine Co. No. 2, Inc., 791 F.2d 416 (5th Cir.1986). The circumstances or factors which affect the degree of care owed by the shipowner include the experience of the crew, the type of carrier

9

involved, the dangers to the passengers peculiar to that type of carrier, the carrier's degree of control over the passengers, and the carrier's ability to take precautions against such dangers.  <u>Smith v. Southern Gulf Marine Co. No. 2, Inc.</u>, 791 F.2d 416, 421 (5th Cir.1986).

In addition to this general duty of care there is a specific duty of care created by Coast Guard regulation.  This is contained in 46 CFR § 131.320 which states:

Safety orientation for offshore workers.

(a)  Before a vessel gets under way on a voyage, the master shall ensure that suitable public announcements are made informing each offshore worker of--
    (1)  In general terms, emergency and evacuation procedures;
    (2)  Locations of emergency exits and of embarkation areas for survival craft;
    (3)  Locations of stowage of lifejackets and immersion suits;
    (4)  With demonstration, proper method or methods of donning and adjusting lifejackets and immersion suits of the type or types carried on the vessel;
    (5)  Locations of the instruction placards for lifejackets and other lifesaving devices;
    (6)  Explanation that each offshore worker shall don an immersion suit and a lifejacket when the master determines that hazardous conditions do or might exist but that offshore workers may don lifejackets whenever they feel it necessary;
    (7)  Which hazardous conditions might require the donning of lifejackets and immersion suits;
    (8)  Types and locations of any other lifesaving device carried on the vessel;
    **(9)  Locations and contents of the "Emergency Instructions" required by § 131.330;**
    (10)  Survival craft to which assigned;
    (11)  Any hazardous materials on the vessel; and
    **(12)  Any conditions or circumstances that constitute a risk to safety.**
(b)  The master of each vessel shall ensure that each offshore worker boarding the vessel on a voyage after the initial public announcement has been made, as required by paragraph (a) of this section, also hears the information in paragraph (a) of this section.
(Emphasis added)

The Emergency Instructions placard required by 46 CFR 131.330 referred to in paragraph (9) states in part:

10

The following are the recommended format and content of the placard for emergency instructions:

### EMERGENCY INSTRUCTIONS

(a) Rough weather at sea, crossing of hazardous bars, or flooding.

    (1) Close each watertight and weathertight door, hatch, and air-port to prevent taking water aboard or further flooding in the vessel.

    (2) Keep bilges dry to prevent loss of stability from water in bilges. Use power-driven bilge pump, hand pump, and buckets to dewater.

    (3) Align fire pumps to serve as bilge pumps if possible.

    (4) Check, for leakage, each intake and discharge line that penetrates the hull.

    **(5) Offshore workers remain seated and evenly distributed.** (Emphasis added)

The logs did not indicate that these instructions were given (required by 46 CFR 131.620 (a)). Not one passenger admitted that it was given. The president of the company was not aware of the regulation and admitted that his company had no policy requiring the master to orient the passengers to safety or hazardous conditions on the vessel. The captain and the mate admitted that this was not done. Bruce Investment and Gulf Tran have obviously violated this Coast Guard regulation at its corporate and management level by not requiring the orientation.

This brings into play the rule of <u>The Pennsylvania</u>, 86 U.S. (19 Wall) 125 (1873). That rule is applicable to instances that do not include collisions. <u>Candies Towing Company, Inc. v. M/V B&C Eserman</u>, 673 F.2d 91, 93 (5th Cir. 1982). If the vessel is guilty of a statutory violation then the ship has the burden of proving that its violation could not have been a cause of the incident. <u>Candies Towing Co., Inc. v. M/V B & C Eserman</u>, 673 F.2d 91, 93 (5th Cir.1982). The rule herein, 46 CFR § 131.320, required the Master to make a public announcement to each offshore worker of the location **and the contents** of the "Emergency Instructions" required to be posted on the vessel. These emergency instructions applied to rough weather at sea, the exact condition facing the M/V

SUPPLIER on December 24, 1998. The instruction required that **offshore workers remain seated and evenly distributed.** (Emphasis added). 46 CFR § 131.320 also required informing the offshore workers of **"(12) Any conditions or circumstances that constitute a risk to safety."** The workers were not informed of the risk of sleeping on a temporary bunk 4 to 5 feet off the floor secured by 3/4 inch screws in 7 to 10 foot seas. No announcement was made. Mr. Hines was not seated, he was attempting to lay on an elevated bunk approximately 4 to 5 feet off the floor. The obvious intent of the rule was to prevent injuries to offshore workers such as the type that happened to Mr. Hines. Plaintiffs cannot sustain their burden of proof that the violation of this rule could not have been a cause of the incident.

    Claimant has sustained his burden of proof even without the aid of The Pennsylvania Rule. There is no real dispute that the weather was rough. The vessel logs prepared by the Captain showed the seas to be 7 to 10 feet and the wind at 35 MPH. Claimant Exhibit B2(pg. 5). The accident report prepared by the captain described the weather conditions as bad. A1. The Coast Guard Accident Report prepared by Captain Unrue indicated the winds to be 30 knots from the north and the vessel speed to be 9.5 knots on a course just slightly east of north (27 degrees). Claimant Exhibit A2(pg. 1).Many of the passengers were seasick. The rough weather made it difficult to walk around the salon area of the vessel. The crew was more experienced as to what to expect in those seas with that vessel. The passengers had never been on that vessel in those sea conditions. The Captain was in control of the ship. Rather than reduce her speed, the vessel proceeded into the heavy seas at almost full throttle. He could have reduced the speed and not allowed anyone to sleep on an elevated temporary bunk without first inspecting or determining what weight it could hold. Under these

circumstances Gulf Tran breached its duty of reasonable care to Mr. Hines. This breach was a substantial cause of the accident. See <u>Williams v. Mccall's Boat Rentals, Inc. and Chevron U.S.A., Inc.</u>, 2002 WL 465170 (E.D.La.); <u>Carimi v. Royal Caribbean Cruise Line, Inc.</u>, 1993 WL 192205 (E.D.La.).

Louisiana Workers Compensation Corporation (LWCC) has filed an intervention in this case seeking reimbursement of the payments made to and on behalf of Todd Hines. The policy issued by LWCC contains an endorsement entitled "WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT". Claimant Exhibit G (pg. 30). It further states that LWCC will not enforce its right to subrogation against anyone named in the Schedule. The Schedule lists "Blanket Waiver". The contract under which Omegas was working required waiver of subrogation. In <u>Allen v. Texaco, Inc.</u>, 510 F.2d 977 (5th Circuit 1975) the Fifth Circuit held that a waiver of subrogation rights precluded the compensation carrier from enforcing its lien in a settlement between the insured's employee and the named company in whose favor the waiver was made. This was followed in <u>Capps v. Humble Oil And Refining Company</u>, 536 F.2d 80 (5th Circuit 1976). The waiver in this policy does not name a particular company but states it is a blanket waiver. Since the contract that Omega was working under required waiver of subrogation this blanket waiver applies and precludes LWCC from getting reimbursement.

Plaintiffs seek limitation of liability claiming that they were without privity or knowledge of the negligent activity that caused the loss. 46 U.S.C. § 183(a). The burden is on the shipowner to prove lack of knowledge or privity. <u>Patton-Tully Trans. Co. v. Ratliff</u>, 797 F.2d 206 (5th Cir.1986).

Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss. Verdin v. C & B Boat Co., 860 F.2d 150, 156 (5th Cir.1988). Here the president and its captain were not aware of the requirements of the Coast Guard regulations applicable to this offshore supply vessel. They should have known about the regulation. This establishes that they were with privity and knowledge of the condition (failure to provide the safety orientation that required the offshore workers to remain seated and evenly dispersed) that caused the accident. Furthermore, an inspection of these settee/bunks would have disclosed that they were held together by 3/4 inch screws and should not be used as a bunk in heavy weather conditions. The president did not require such inspections and none were done despite the fact that the vessel was 18 years old at the time of the incident.

Plaintiffs removed and destroyed the settee/bunk on the M/V SUPPLIER after the incident. This was done in December 1999 according to the testimony of its president Ross Bruce. Mr. Bruce was served personally in August 1999 with a state court suit for damages filed by Mr. Hines against Gulf Tran. The suit specifically alleged the defective condition of the settee/bunk. Gulf Tran through its present counsel filed an answer to that suit in early September 1999 denying the allegations. Despite its knowledge of the alleged condition of the settee/bunk it removed and destroyed this evidence. Its Captain described the screw as being bent in a certain way to support his speculation that the accident did not happen as alleged by claimant. One would think that plaintiffs would have preserved this evidence to support its current allegation unless the evidence did not in fact support its captain's speculation. Failure to produce this evidence should result in an

adverse presumption against plaintiffs that the evidence would not have been favorable to it. Vodusek v. Bayliner Marine Corporation, 71 F.3d 148 (Fourth Circuit 1995)

Finally, claimant is entitled to a preferred maritime lien on the M/V SUPPLIER. The United States Supreme Court recognized that a claim for personal injury suffered by a passenger on a vessel caused by the crew's negligence was a maritime tort with the right to a maritime lien. The City of Panama, 101 U.S. 453 (1879). Claimant's right to a maritime lien against the vessel based on personal injuries he received as a result of the vessel and crew's negligence is a characteristic maritime lien recognized by United States law. See, Thomas J. Schoenbaum, Admiralty and Maritime Law, (3d ed. 2001) 436-437. The Commercial Instruments and Maritime Liens Act, 46 U.S.C.A. § 31301 (5) defines a preferred maritime lien as "a maritime lien for damages arising out of a maritime tort." The preferred maritime lien is given priority ahead of the preferred ship's mortgage. 46 U.S.C.A. § 31326.

III. Conclusion

Claimant has carried his burden of proving that Gulf Tran breached its duty of reasonable care under Kermarec, supra. Gulf Tran also violated applicable Coast Guard Regulations designed to protect the offshore worker while riding an offshore supply vessel like the M/V SUPPLIER. Plaintiffs defend the claim alleging that the accident did not happen. Its reliance on the speculation of Captain Unrue is misplaced. It hired an expert to disprove claimants accident. Its expert could not disprove the accident but admitted that the accident could have happened as explained by Mr. Hines. Mr. Hines did not hit the passenger below because of the roll and pitch that caused the bunk

to break in the first place. That action would also have caused Mr. Hines to hit just the edge of the bunk as he described it.

What plaintiffs are really saying is that Todd Hines was a substance abuser before this accident and after this accident. In other words, they say Mr. Hines is a bad guy and therefore should not recover. There has been absolutely no evidence that substance abuse was involved in this incident. Yes, Mr. Hines had problems with drugs and alcohol. Does that make him any less hurt? No, he has still suffered a significant injury that will restrict his future earning capacity. He was a fairly high wage earner before this accident despite his addiction. His addiction should not be used to prejudice the trier of fact. Mr. Hines is entitled to a verdict in his favor that will fairly compensate him for his injury and disability.

Respectfully submitted,

_____
Danny J. Lirette (Bar Roll #8619)
Dexter A. Gary (Bar Roll #21292)
LIRETTE & GARY, L.L.C.
10 Professional Drive
Post Office Box 2968
Houma, Louisiana 70361-2968
Telephone: (985) 876-2997
COUNSEL FOR CLAIMANT,
   TODD BALLARD HINES

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on this 2nd day of December, 2002, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by mailing the same by United States mail, properly addressed and first class postage prepaid.

_____
Danny J. Lirette   -   #8619