

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT | * | CIVIL ACTION |
| OF BRUCE INVESTMENT CO., INC., as the | * | NO. 00-0372 |
| Owner of M/V SUPPLIER, and GULF TRAN, INC., as the | * | LORETTA G. WHYTE CLERK |
| Operator of M/V SUPPLIER , praying for | * | SEC. S(2) |
| Exoneration from or Limitation of Liability pursuant to | * | JUDGE LEMMON |
| 46 U.S.C. Secs. 183 *et seq.*. | * | MAG. WILKINSON |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### PRE-TRIAL MEMORANDUM

**NOW INTO COURT COME PLAINTIFFS-IN-LIMITATION,** Bruce Investment Co., Inc., and Gulf Tran, Inc., and submit the following memorandum on certain basic issues before the Court in the captioned matter.

The Court has jurisdiction over this matter under the Admiralty and Maritime Law of the United States, 28 U.S.C. § 1333, Suppmental Rules for Admiralty 9(h) and specifically, the Limitation of Liability Act 46 USC § 183, *et. seq.*

A petition for limitation, alternatively for exoneration from liability, was filed by Petitioners, Bruce Investment Co., Inc., and Gulf Tran, Inc., in February 2000. At the time of the reported incident, the M/V Supplier was owned by Bruce Investment Co., Inc., but manned, provisioned, and crewed by Gulf Tran Inc., under an oral bareboat charter( standard in the trade) making it the operator and owner *pro hac vice* under Admiralty law. The filing followed receipt of a written notice of a claim from the attorney for Todd Ballard Hines, claiming injury from an accident that was alleged to have occurred on or about 24th December 1998 while Todd Hines was a passenger aboard the untility vessel, **M/V Supplier.** The **Supplier** was on a routine customer dispatched trip from offshore near Ship Shoal Block 354 into the customer's base located at

Fourchon, LA. The trip was a routinely scheduled trip by Gulf Tran's customer for transport of garbage, equipment and other offshore materials. The vessel was also scheduled to back load material and supplies at the customer's base in Fourchon for delivery offshore. Although platform personnel and contract workers were usually transported by helicopter to the Ship Shoal field by Gulf Tran's customer, field vessels, including the **M/V Supplier** were occasionally ordered to transport personnel if the weather was too inclement for flying, or if there was insufficient helicopter transport available.

Several days before 24th December 1998, the **M/V Supplier** had been ordered to transport Todd Hines, a supervisory employee of Omega Natchiq, and several members of his contractor crew, to the production platform at Ship Shoal 354 for certain piping and welding work that was to be conducted there by several of Newfield's contractors. During the trip offshore, Todd Hines had argued with members of the vessel's crew.

Increasingly inclement weather conditions prevented completion of the job that Todd Hines and his crew were dispatched to the platform to perform. In various meetings, conferences, or phone calls to which Gulf Tran was not a participant, the various contractors responsible for the work, decided that the Omega Natchiq (Todd Hines) portion of the contracted work, could not be performed for several days. On Christmas Eve, Monty Rivers, the White Wing Inspection supervisor (and Hines' immediate supervisor), told Todd Hines' that his crew would be sent in later that day because they could not perform their work. The weather was already bad, and was expected by Hines and Rivers, to become even worse with the passing of a cold front, not atypical for the season. Hines and Monty Rivers had a heated arguement over the fact

that Hines' crew were only given a choice of making the long arduous trip in bad weather on a boat, or could hold over on the platform over Christmas, until the weather improved. Not surprisingly, not one of Hines' crew made the decision to remain on the platform over Christmas, although Monty Rivers stayed and finally went in by helicopter.

Later on Christmas Eve, 1998, Todd Hines and his crew were boarded, with some difficulty due to bad weather, onto the **M/V Supplier** for the trip to Fourchon. Mr. Hines immediately complained about the conditions, even calling the platform demanding that he and his men be brought back and returned to the platform to be transported to shore by helicopter.

Hines and Rivers heatedly argued about the matter, but Hines finally accepted that his ride home would be by boat, together with the rest of his crew and the boat's crew. Hines argued with the crew that he must be provided with a bunkroom, insisting that he be permitted to use the Captain's bunk, although it was to be used by the Captain to rest up for the next navigational watch. Hours into the voyage, Hines reported to the Captain, Rene' Baxter, that a bunk he had been using below, had collapsed and that he had fallen onto the deck of the extremely crowed compartment. Richard Sonnier had been sleeping on the lower cushion of the indicated fold up settee, but he had not been awakened by the event, although Hines reported that he had struck the cushion on which Sonnier was lying, as he fell. None of the vessel's crew, and none of several members of Hines' crew witnessed the accident. Capt. Baxter went below and found one of the settee fold-up bunks swinging from the overhead on the two straps normally utilized to hold the outer edge in the upright position. The inner edge of the cushion support, attached by the shipbuilder with nine wood screws through three hinges, was detached from the bulkhead

to which it had been affixed by the original ship builder, Universal Shipyards, when the vessel was built for the original owner in 1981. Gulf Tran had purchased the used vessel known as the **M/V Wade B**, in 1994, from Daniel Bruce Marine Inc., for $275,000.00.

Although Mr. Hines claimed that he had been in the settee when it pulled away from the wall, he alleged that he had fallen over the outboard side of the cushion, both avoiding the holding straps and defying the laws of gravity, had hit the cushion below without disturbing Mr. Sonnier, and had fallen onto the deck. He initially claimed only minor injures and eschewed medical treatment, even when he arrived at dock. All in all, the circumstances surrounding the reported incident were extrememlly suspicious, and it appeared that the incident had been staged by Mr. Hines, who at the time in question, had many perceived motives to be mad at everyone, including the crew of the vessel. Only days before Mr. Hines had been assigned offshore by Omega Natchiq, he had been hosptialised at the Charter Cypress Hospital in Lafayette for treatment of bi-polar disorder, long-term drug addiction, severe depression, and suicidal tendencies; all mental and physical disorders that had affected his mental and physical condition repeatedly for many years. He was discharged from the institution before completion of treatment for **refusal to follow the rules** of the hospital; another serial trait of Mr. Hines.

Literally hundreds of Universal hulls were built and used in the offshore oil industry, and many of the original vessels are still operating at present. Gulf Tran still operates two or three. A common feature of the vessels, incorporated by the shipbuilder, was the fold-up settee. Gulf Tran has never had a single problem with any fold-up settees before Hines' alleged accident, still operatng one or more vessels with similar settees still in place. Gulf Tran had never heard of a bunk suddenly or unexpectedly pulling away

from the bulkhead. Petitioners had no notice or knowledge of any potential problem with the attachment of the upper settee cushions to the bulkhead, and had absolutely no reason to suspect that there were any potential problem with the specific settee in this case. Although an inspection of the fixment of the bunk was not legally required of petitioner's, any pre-accident inspection would have disclosed only that all of the screws were flush, tight, and firmly set into the marine ply of the bulkhead and cushion bottom.

Hines was only a non-paying passenger on the **Supplier**. The vessel's only obligation to Mr. Hines, is completely controlled by the U. S. Supreme Court holding in **Kermarec *vs*. Compagnie Generale Transatlantique**, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed. 2d 550 (1959) which requires only the exercise of reasonble care under the circumstances of each case. Petitioners' were under no obligation to perform specific or decontructive inspections of gear or equipment for the benefit of Mr. Hines. Notification of known or reasonably discoverable hazards, not open and obvious to the passenger, is the most that would ever be required under the law. Unless there was some evidence of prior notice to Petitioners of a specific hazard, mere existence of a hidden hazard, if there were one, would not be actionable by Mr. Hines. **Perry *vs*. Morgan Guaranty Trust Co.**, 528 F.2d 1378 (5th Cir., 1976), even if he were a Jones Act seaman. Transitory conditions or events do not constitute negligence, or even unseaworthiness. **Garcia *vs*. Murphy Pacific Marine Salvage Co.**, 476 F.2d 303 (5th Cir., 1978).

It seems ludicrous that Mr. Hines, an old hand at offshore employment (he was the supervisor for Omega) now claims that the vessel should have advised him that the vessel would encounter heavy weather. He already knew that and argued with Monty Rivers about coming in on the boat because of the heavy weather. He made an adult's

decision to come in, rather than stay out on the platform over Christmas, notwithstanding the expected bad weather. Just as incomprehensible, is his assertion that the crew should have advised him that using the upper settee during rough weather would be, well—rough. If he did not already know this simple fact, only ten seconds in that settee would have rather conclusively taught him about the laws of physics effecting a vessel in heavy seas. If Hines did in fact use the upper bunk, the danger of being thrown out or bumped around was open and obvious, and required no warning. As to the bunk pulling away from the wall, if it did, Gulf Tran had no factual or legal reason to think that would ever occur, either. It never had!

Hines seems to place great reliance on 46 CFR 131.320, which he presumably wishes to argue, places some additional burden on Petitioners, above and beyond the clear dictates of **Kermarec**. This regulation, issued under the Coast Guard's general regulatory authority, cannot overrule **Kermarec**--only Congress can do that. In any event, the regulation is extremely general, is similar to pre-flight instructions by airlines, and has no demonstrable relevance to Mr. Hines' allegations about an unexpected bunk failure in this case. Clearly accepting the realities maintaining compliance with the holding of **Kermarec**, the CFR cited, addresses in the most general, vague, terms, that the announcement or notification by the vessel should cover conditions or circumstances that constitute a risk to safety; but it must be presupposed that the condition is actually known, or is reasonably knowable. It does not mandate a stem to stern dismantling inspection looking for every possibility. Counsel's rather limited resources did not disclose a single case citing, applying, or interpreting the regulation.

Mr. Hines retained Ronald L. Compana and Geoff Webster, professional witnesses, to offer opinions in this case. Their individual reports and collective opinions, are rife with references to ship building and design, platform operation, design of passenger areas, and assertions of unseaworthiness, which are not issues in this litigation. Moreover, their opinions cannot and do not even attempt to rule out the high possibility of other causes for the detachment of the bunk from the wall, such as the direct, intentional, intervention of the plaintiff in staging the accident. The written reports of these "experts" are predictive of testimony that is of no value to the Court in determing simple facts, explaining scientific or physical causes of events, or workings of complex mechanics. There are no complex scientific or mechanical issues in this case; only those issues relating to the credibility of the claimant, the only witness to the unlikely event of which he complains. The only function of these experts is to confuse the Court on issues of causation, complicate a simple case, and to redirect the focus of the case on the reliability of the claimant as a witness in his own behalf. Except for the continuous uproar caused by Mr. Hines during this trip, it was completely uneventful, accident free, and entirely routine for the crew of the vessel.

These expert reports, with numerous references to design and shipbuilding standards and legal standards (warranty of seaworthiness) inapplicable to this case, are precisely the type targeted for exclusion from consideration or admission by **Daubert vs Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579 (1993) and subsequent revisions to the Federal Rules of Evidence. The Court should preclude the testimony to be offered from these witnesses, as it will not "assist the trier of fact," and will not be helpful, but will be used so as to confuse the trier of fact.

Gulf Tran suggests that the testimony from the fact witnesses will clearly indicate that there was not an "accident." The detachment of the settee was intentional, and executed by the claimant himself. There should be no recovery.

Peripheral to the liability issues affecting Petitioners, is the question of whether the LWCC may participate as a claimant in this case. The LWCC requested intervention into the concursus long after the general default had been signed by the Court, and filed into the record. Petitioners had no objection to the **filing** of the intervention after the Court's cut off date for filing of claims, but reserved all rights on the merits. On the merits, it appears that the intervention of the LWCC came to late to participate in the concursus against the petitioner's and would have no actionable claim against the Petitioners.

The medical record is extensive. A finding of liability will be precatory to exploring this issue. Petitioners would ask that they be allowed to brief the medical/damages issues at the conclusion of the case, rather than file an extensive pre-trial briefing on the matter.

            Respectfully submitted

            _/s/ Fred E. Salley_
            FRED E. SALLEY, T.A. (#11665)
            SALLEY & ASSOCIATES
            P.O. Box 3549
            Covington, LA 70434
            **Counsel for Plaintiffs,**
            Bruce Investment Co., Inc. and Gulf Tran, Inc.
            Tel (985)-867-8830
            Fax (985)-867-8927

- 9 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on all counsel of record by facsimile, delivery notification requested, and by placing same in the United States Postal Service, properly addressed and postage prepaid this 2nd day of December 2002.

_____
Fred E. Salley