FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 JAN -7 AM 11: 29

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In the Matter of the Complaint of Bruce | * | CIVIL ACTION |
| Investment Co., Inc., as the Owner of | * | |
| M/V SUPPLIER, and Gulf Tran, Inc., | * | |
| as the Operator of M/V SUPPLIER, Praying | * | NUMBER 00-0372 |
| for Exoneration from or Limitation of Liability | * | |
| Pursuant to 46 U.S.C. Section 183 *et seq.* | * | SECTION S MAG. 2 |

## POST TRIAL MEMORANDUM

This matter was tried to the Court on December 9, 10 and 12, 2002. Testimony and documentary evidence introduced at the trial established the following facts.

### LIABILITY

Todd Hines was a working foreman for Omega Industries in December 1998. On December 20, 1998, he and his crew boarded the M/V SUPPLIER for transport to Ship Shoal Block 354 to perform work for Allseas, Inc. The vessel departed Port Fourchon, Louisiana, at 8:30 PM December 20 and arrived at the platform at 4:00 AM December 21, 1998. The crew and their equipment were offloaded without event. They then set up to commence working, but were unable to start work due to bad weather conditions.

Mr. Hines and his crew more or less were on standby until the morning of December 24, 1998, when a decision was made by Allseas and/or the platform owner to send the crew to shore. Reasons for sending the crew in included problems with the pipeline they were to work on and increasingly rough weather. Transportation was again to be provided by the M/V SUPPLIER. Mr. Hines requested alternative means of transportation because of his concern regarding the weather and sea conditions and their ability to offload from the platform to the vessel safely. This request was refused and the crew was loaded onto the vessel at approximately 9:15 on the morning of December 24, 1998. The vessel left the platform at 10:00 AM en route to Port Fourchon, Louisiana.

The M/V SUPPLIER was a 106 foot offshore supply vessel built in 1980, owned by Bruce Investment, Inc and operated by Gulf Tran, Inc., under an oral charter agreement. The vessel was captained by Vincent "Bill" Unrue, who had boarded the vessel the evening of December 23, 1998, while it was in Port Fourchon. This was Captain Unrue's first time working on that vessel. The remainder of the crew consisted of a mate, Rene Baxter, an engineer, Kevin Clemon, and a deckhand, Robin Pittman.

Testimony from Eric Picard, an Omega employee, and Richard Sonnier, a TNT, Inc. employee, described the conditions on the M/V SUPPLIER prior to the occurrence of this incident. Mr. Sonnier testified that the ride was so rough that one had to hold on to something to walk across the salon area to get to the restroom. He also described the movement of the vessel as going from side to side and up and down to such an extent that it would raise and lower you approximately 3 inches off the bench, while trying to lay down.. Mr. Picard corroborated this testimony. He described the conditions as being very rough. He also said it was very difficult to move about the

vessel without getting thrown around. Both Mr. Picard and Mr. Sonnier were seasick as a result of the vessel movement caused by the sea conditions.

The testimony of both Mr. Picard and Mr. Sonnier established that the fold out settee/bunk was prepared and offered for use to the passengers by a crew member of the M/V SUPPLIER. It was undisputed that there were no restrictions or rules placed on the use of this settee/bunk by Gulf Tran, Bruce Investment, or the Captain of the M/V SUPPLIER. It was also undisputed that no one with the crew of the M/V SUPPLIER performed any type of safety orientation for the passengers.

Todd Hines climbed up onto the folded out settee/bunk approximately 20 to 30 minutes prior to the incident. At the time of the incident the M/V SUPPLIER was headed northeast, towards Port Fourchon. It was making 9.5 knots (10 knots was full throttle) into a 30 knot (the equivalent of 35 mph) north wind in 7 to 10 foot seas. Exhibit B5 and Exhibit A2(1). Mr. Hines described his position on the settee/bunk as having his back to the wall, lying on his left side, holding onto the nylon straps with his head on the end closest to the rear of the vessel. He felt the vessel go up. It then took a long fall down at which point he fell to the floor below. In the fall he thought that he may have struck the edge of the bench below.

Mr. Sonnier was on the bench below Mr. Hines. He described his position as being on his right side, curled up into the corner of the bench closest to the side that meets the wall of the vessel. His head was on the end of the bench nearest the rear of the vessel. Mr. Sonnier did not see the settee/bunk separate from the wall but he did hear a noise as it occurred. He immediately turned to see what had happened and saw Todd Hines on the floor. He also saw the settee/bunk swinging from

its straps dangerously close to his face with the screws sticking out of the hinges. He described the screws to be about 3/4 to 1 inch wood screws. It looked like the screws had pulled out from the wall.

Eric Picard, likewise, did not see the settee/bunk separate from the wall since he was attempting to go to sleep in a bunk room adjoining the salon. He also heard a loud crash and immediately jumped up and opened the door to see Todd Hines on the floor and the settee/bunk hanging from its straps. He also looked at the screws and described them to be about ½ to 3/4 inch wood screws. It also appeared to him that the screws had pulled out from the wall.

Captain Unrue prepared the vessel logs for the date of the incident as well as the accident reports. He described the weather conditions as "bad". Exhibit A1. He recorded the sea conditions as being 6-9 in the morning and 7-10 in the afternoon and the wind coming from the north at 35 mph. He reported to the Coast Guard that the cause of the incident was structural failure caused by heavy weather damage. Exhibit A2(1).

The only disputed testimony about the weather and sea conditions came from Rene Baxter, the mate who was at the wheel at the time of the incident. Ms Baxter insisted that the weather was not bad and that the seas were not rough. This is contrary to the testimony of **all** the other witnesses including her captain. This even contradicts her own description of the seas contained in her own written statement prepared the same day of the accident.

Why would Ms. Baxter insist that the seas were no worse than 5 to 7 feet? Because she had previously testified that seas in the 9 foot range would crash over the bow and should require the person at the wheel to throttle back for safety's sake. Ms. Baxter was the person at the wheel. If she were to admit that the seas were as described by Captain Unrue and the rest of the witnesses, she

4

would be admitting to her own fault in contributing to the cause of this incident. This was something she could not do in front of her former boss, Ross Bruce.

No one with Bruce Investment or Gulf Tran knew how the settee/bunk was attached to the wall. No one knew how much weight it could safely hold. No one was required to inspect the settee/bunk before it could be used despite its age (18 years) at the time of this incident. There was no company policy regarding its use under bad weather conditions. However, the captain did have the authority to prevent its use.

Petitioners attempted to prove that the accident could not have happened as described by Mr. Hines. They offered the testimony of Mr. Sheldon Cass, a marine surveyor on this issue. Their attempt to disprove the accident fell woefully short. Mr. Cass relied on a dimensioned drawing he prepared. However, he could not recall where he obtained the dimensions in the drawing. He copied and enlarged a photo of the settee/bunk on a different vessel to support his opinion that if the settee/bunk had separated from the wall it might have hit the edge of the bunk below. On cross examination he admitted that if his dimensions were off that his opinion could be wrong. He also conceded that the shorter the strap holding up the bunk, the less likely the settee/bunk would strike the bunk below. He agreed that the pitch and roll of the vessel would affect how a passenger could fall either striking the edge of the bunk below or just missing it. Finally, he admitted that the accident could have happened as Mr. Hines described it.

Petitioners also claimed that "it appeared that the incident had been staged by Mr. Hines, who at the time in question, had many perceived motives to be mad at everyone, including the crew of the vessel." Petitioners' pre-trial memo page 4. This was based on their allegation that Mr. Hines

had been in heated arguments with the company man and the vessel crew. However, there was absolutely no evidence of any arguments between Hines and the company man or Hines and any of the crewmembers. There was testimony that Hines wanted to use a crew bunk but was refused by the captain, despite the claim by Ms. Baxter that there were "many" bunks available. The captain did not describe any heated arguments. The vessel crew were not aware of any heated arguments. Monty Rivers, the company man, did not describe any arguments with Mr. Hines.

Petitioners claimed that they were not negligent because there were no prior claims of a settee/bunk failing. Ross Bruce, the owner, did admit, however, that this was the first time that he was ever made aware that the settee/bunk was used while the vessel was underway in the Gulf of Mexico heading into 7 to 10 foot seas and a 30 knot wind while at almost full throttle. There was no evidence to indicate that the settee/bunk was previously used under similar conditions that it was being used on December 24, 1998. As Judge Rubin said in <u>Dennis v. Central Gulf Steamship Corporation</u>, 323 F.Supp. 943, 946 (E.D. La. 1971), when faced with a similar argument, "Negligence does not become excusable because it is oft repeated."

Expert testimony from Captain Ron Campana described the motion of this type of vessel while traveling in sea and weather conditions as described on the vessel logs. He testified that the vessel would pitch and roll and would occasionally crash as it fell in the seas. It was his opinion that the settee/bunk should not be used while the vessel was underway especially in the sea conditions the vessel faced on the day of this incident. He also testified that the captain should have provided a safety orientation to the offshore work crew that would include a warning not to use the settee/bunk while the vessel was underway.

Expert testimony from Geoffrey Webster, a naval architect, established that the settee/bunk was not a reasonably safe bunk. It was not solidly secured below and it did not have protection from the risk of a person being rolled or thrown out in rough weather.

Coast Guard regulations applicable to offshore supply vessels recognize the need to orient offshore workers when boarding a vessel especially during rough sea conditions. 46 C.F.R. § 131.320; 46 C.F.R. § 131.340. These regulations require a safety orientation to make the offshore workers aware of the hazards on the vessel and to instruct them on the contents of the emergency instruction placard. The emergency instructions include what should be done in rough weather. That placard was in fact on the M/V SUPPLIER but was never brought to the attention of the passengers. This orientation and instructions were not given by any crewmember of the M/V SUPPLIER. Part of these regulations require the passengers to remain seated for the duration of the rough weather ride.

Maritime law applies to an accident to a passenger while on board a vessel. Kermarec v. Compagnie Generale Transatlantique 79 S.Ct. 406 (1959). The vessel owner owes to the passenger the duty of reasonable care under the circumstances. Kermarec v. Compagnie Generale Transatlantique, supra. In Smith v. Southern Gulf Marine Company No. 2, Inc., et al., 791 F.2d 416 (Fifth Cir. 1986), a passenger on a crew boat was injured when he slipped in vomit as he exited the rear door of the vessel. The Fifth Circuit reviewed Kermarec and the cases dealing with the duty of care owed to a passenger on a vessel. The Court observed that " [d]espite the various formulas enunciated in these cases, a review of the facts and the stated standards of care shows that shipowners, relatively speaking, are held to a high degree of care for the safety of passengers."

Smith v. Southern Gulf Marine Company No. 2, Inc., et al., 791 F.2d 416, 420. The court refused to adopt a different standard than that of reasonable care under the circumstances of each case. It then listed some of the circumstances to consider including, "the experience of the crew, the type of carrier involved, the dangers to the passengers peculiar to that type of carrier, the carrier's degree of control over the passengers, and the carrier's ability to take precautions against such dangers." Smith v. Southern Gulf Marine Company No. 2, Inc., et al., 791 F.2d 416, 421. The court went on to reverse a verdict in favor of the defendant and found that the vessel owner should have discovered the vomit prior to allowing passengers to disembark the vessel. The ride to the platform was very rough and many of the passengers got seasick. Garbage bags were passed out to some of the passengers and the toilet facilities were not working. The court also recognized that because of the rough weather, "the risk of danger to the passengers was certainly greater and, consequently, the duty of the crew to attend to the comfort and safety of the passengers was, quite reasonably, heightened". Smith v. Southern Gulf Marine Company No. 2, Inc., et al., 791 F.2d 416, 421.

The circumstances in the case before this Court are very similar. The weather was very rough. The ride to shore was going to be lengthy lasting 8 to 9 hours. Despite evidence that there were crew bunks available, the captain refused to allow Mr. Hines to use these. A member of the vessel crew prepared a settee back for use as a bunk. He did not inspect the settee/bunk before it was used nor was an inspection required by the vessel owner/operator. The crew member did not know how much weight the settee/bunk could safely hold. The vessel was heading northeast into a 30 knot (almost gale force) north wind in 7 to 10 foot seas which were striking the port bow of the vessel. This caused the vessel to pitch and roll heavily which in turn caused the passengers to be tossed about. This

settee/bunk should not have been offered to the passengers for their use under these circumstances. The captain and crew knew or should have known that there was a foreseeable risk of injury in allowing the use of this settee/bunk under those circumstances.

The circumstances in this case are also quite similar to those in <u>Williams v. McCall's Boat Rentals, Inc. and Chevron U.S.A., Inc. 2002 WL 465170 (E.D.La.)</u>. There Judge Porteous found the vessel captain negligent in the manner he operated his vessel in seas very similar to those faced by the M/V SUPPLIER. In another rough weather case, Judge Livaudais took into consideration the rough weather conditions and the ability of the ship's crew to control the ship in finding the vessel negligent in failing to post attendants at a ship's doorway during rough weather similar to the weather encountered by the M/V SUPPLIER. <u>Carimi v. Royal Caribbean Cruise Line, Inc.,</u> 1993 Wl 192205 (E.D.La.).

The **decision to sail** in those weather conditions was not negligent conduct complained of herein. It was the decision to allow passengers to use the settee/bunk given the sea and weather conditions and the speed of the vessel under those conditions. There was no negligence on the part of Allseas or the platform owner in allowing the vessel to take those passengers to shore. The ultimate decision to sail was that of the captain of the vessel and the captain herein did not think it was too rough to proceed. <u>Smith v. Southern Gulf Marine Company No. 2, Inc., et al., 791 F.2d 416, 419</u>.

### DAMAGES

After the incident Mr. Hines thought that his back may have been injured. He did not seek immediate medical attention because he thought he would get better. On December 27, 1998, he went

to the emergency room at Dauterive Hospital in New Iberia, Louisiana, complaining about back and neck pain. X-rays of the cervical and lumbar spine were negative and he was referred to an orthopedic for follow-up. He saw Dr. Cobb, an orthopedic in Lafayette, Louisiana, who requested an MRI of the cervical and lumbar spine. This was not done since Mr. Hines admitted himself to Charter Cypress Hospital, a psychiatric hospital in Lafayette, Louisiana. He was suffering with depression, drug and alcohol dependancy, and suicidal thoughts. He was discharged from that hospital on February 5, 1999, and then moved back to Lake Charles, Louisiana, his home town.

Mr. Hines admitted himself to a psychiatric hospital one other time during the course of his medical treatment. This was in November 1999, between his back and neck surgery. His complaints at that time were also drug and alcohol abuse and major depression. He was treated by Dr. Charles Murphy, a psychiatrist, who has continued to treat Mr. Hines through the date of trial. Hines does not claim that his alcohol and drug abuse were caused by the accident. He does not claim that his bi-polar symptoms were caused by the accident. Mr. Hines' claim is that these were pre-existing conditions that complicated his recovery. Dr. Murphy testified that a person with alcohol and drug abuse history will more likely relapse when injured and treated with narcotic type medications. The stress from the incident and surrounding legal proceedings would also cause the bipolar symptoms to reoccur. Mr. Hines has acknowledged his drug and alcohol problems. He has admitted that it is something he constantly struggles with.

After moving to Lake Charles he started seeing Dr. R. Dale Bernauer, an orthopedic surgeon. He saw Dr. Bernauer on March 3 , 1999, complaining about neck pain, right arm pain, both hands going numb, back pain with right leg pain and numbness to the right foot. Dr. Bernauer ordered an

MRI of the neck and back and an EMG. The MRI's were positive for a herniated disc at L 4-5, and at C 5-6 and C 6-7. The EMG showed L 5 nerve root compression and carpal tunnel syndrome. He then had a cervical and lumbar myelogram performed which confirmed the cervical and lumbar disc injuries.

Dr. Bernauer recommended an anterior lumbar discectomy and fusion. This was done on August 19, 1999 at Lake Charles General Hospital. A general surgeon had to make an incision in the abdomen called a retroperitoneal exposure to allow the orthopedic surgeon to go behind the abdominal contents to the spine. The disc space at L4-5 was identified and the whole disc was removed. Cadaver bone was put into threaded cortical dowels and then screwed into the disc space to complete the fusion part of the surgery.

The back fusion started to heal slowly but Mr. Hines continued with neck pain. In February 2000 Dr. Bernauer performed a two level anterior cervical fusion at C 5-6 and C 6-7. A plate was also used to secure the fusion site. The cervical fusion healed satisfactorily and has reduced the pain experienced in the neck and scapular area.

At one point Mr. Hines' lumbar fusion did not appear to be healing properly. Dr. Bernauer considered further surgery. Eventually Mr. Hines' fusion progressed satisfactorily and further surgery was not needed.

Dr. Bernauer attributes these injuries to the fall as described by Todd Hines. He has assessed a 10% whole body permanent impairment. A functional capacity evaluation was done in June 2001. The evaluation indicated that Mr. Hines was limited to sedentary type work which means no lifting greater than 10 to 20 pounds; no stooping, squatting, bending, and climbing. Petitioners have not

offered any evidence to rebut the testimony of Dr. Bernauer. In fact petitioners did not call Dr. Gordon Nutik, the orthopedic expert they retained, which gives the presumption that his testimony would not have rebutted that of Dr. Bernauer.

Given the two surgeries and the permanent physical restrictions placed on Todd Hines, he should recover $275,000.00 in general damages; $175,000.00 for the back fusion and $100,000 for the neck fusion.

Claimant's vocational expert, Glenn Hebert, testified that the permanent restrictions will eliminate claimant from continuing in his oilfield construction work. He stated that the type of work that Hines was doing at the time of the accident was a good fit for him, given Mr. Hines' problems with drugs and alcohol. The working environment was very structured and put him in a place where he did not have easy access to drugs and alcohol. Mr. Hebert also testified that it was not unusual for oilfield construction workers to move from employer to employer as Mr. Hines had done. The practice in the industry was that the employees would move to the company that had the most work. Finally it was his opinion that if Todd Hines had not been injured that he would be capable of making $40,000 to $50,000 per year as of the trial date. Mr. Hebert felt that Todd Hines would be capable of earning $5.15 to $8.00 per hour without retraining or $12.00 per hour after retraining which would take approximately two more years. Petitioners did not offer any expert testimony to refute Mr. Hebert.

Todd Hines earned $46,956.00 during the twelve month period prior to the accident. His social security earnings record indicates that he earned the following wages for the five year period before the accident:

| Employer | 1994 | 1995 | 1996 | 1997 | 1998 | Total |
|---|---|---|---|---|---|---|
| Omega Service Ind. | $8,976.00 | $19,789.50 | $8,766.00 | $0.00 | $23,734.50 | $61,266.00 |
| M&G Testing & | $39.74 | $0.00 | $0.00 | $0.00 | $0.00 | $39.74 |
| Universal | $19,119.01 | $1,711.75 | $1,006.50 | $0.00 | $594.75 | $22,432.01 |
| Seawolf Services | $0.00 | $9,313.35 | $0.00 | $0.00 | $0.00 | $9,313.35 |
| Piping Engineering | $0.00 | $2,553.20 | $57.00 | $0.00 | $0.00 | $2,610.20 |
| World Wide | $0.00 | $1,120.30 | $0.00 | $0.00 | $0.00 | $1,120.30 |
| Atlantic Marine | $0.00 | $0.00 | $2,689.50 | $8,443.34 | $0.00 | $11,132.84 |
| Shaw Bagwell | $0.00 | $11,801.79 | $0.00 | $0.00 | $2,010.00 | $13,811.79 |
| Allen Process | $0.00 | $0.00 | $1,279.30 | $0.00 | $0.00 | $1,279.30 |
| Fluid Crane | $0.00 | $0.00 | $348.00 | $0.00 | $0.00 | $348.00 |
| Southwest | $0.00 | $0.00 | $3,321.11 | $0.00 | $0.00 | $3,321.11 |
| Mega International | $0.00 | $0.00 | $1,446.25 | $0.00 | $0.00 | $1,446.25 |
| Roberds Johnson, | $0.00 | $0.00 | $0.00 | $2,896.00 | $0.00 | $2,896.00 |
| Laredo | $0.00 | $0.00 | $0.00 | $6,375.00 | $0.00 | $6,375.00 |
| Orizon Industries | $0.00 | $0.00 | $0.00 | $16,009.64 | $0.00 | $16,009.64 |
| SRS Products | $0.00 | $0.00 | $0.00 | $2,625.00 | $0.00 | $2,625.00 |
| SRS Wintergreen | $0.00 | $0.00 | $0.00 | $2,100.00 | $0.00 | $2,100.00 |
| Lake Charles Steve. | $0.00 | $0.00 | $0.00 | $0.00 | $75.00 | $75.00 |
| Dubois Sheet metal | $0.00 | $0.00 | $0.00 | $0.00 | $3,999.93 | $3,999.93 |
| Pax, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $3,955.00 | $3,955.00 |
| Halter Calcasieu | $0.00 | $0.00 | $0.00 | $0.00 | $659.20 | $659.20 |
| Total | $28,134.75 | $46,289.89 | $18,913.66 | $38,448.98 | $35,028.38 | |

This averages out to $33,363.13 per year. His past loss of earnings after tax based on that figure was $113,316.00. If one uses the $46,956.00 of actual earnings the twelve months prior to the accident,

13

his past loss of earnings after tax would have been $151,269.00. A fair representation of Mr. Hines' past loss is probably somewhere between these two figures or around $130,000.00.

In calculating the loss of future earnings for Todd Hines, Dr. Rice used a Department of Labor Statistic that assumed a future work life of 20.9 years. This work life included time periods where Mr. Hines would not be employed for various reasons such as temporary layoffs and/or illness. Using that work life and a future earning capacity of $6.58 per hour (mid point between $5.15 and $8.00), Dr Rice determined the loss of future earnings to be a net $441,705.00. Using the same work life but a future earning capacity of $12.00 per hour, the loss of future earnings would be a net $331,772.00. Again a fair representation of Mr. Hines' loss of future earnings would be somewhere between those two figures, or $385,000.00.

Finally Todd Hines incurred $84,503.28 in medical expenses which was paid by LWCC. Claimant is entitled to recover this amount subject to the right of LWCC to recover, which right is disputed by claimant. The parties will brief this issue as per the Court's order, after a decision on the merits between Hines and petitioners.

## LIMITATION OF LIABILITY

Gulf Tran, Inc. and Bruce Investment, Inc. have sought limitation of liability equal to the value of the vessel. A bond has been posted in the amount of $550,000.00 which was the accepted value of the vessel at the time of this incident. Petitioners must prove that they were without privity or knowledge of the circumstances which caused the accident in question. 46 App. USCA § 183. This includes what the owner knew or should have known. Verdin v. C & B Boat Co., 860 F.2d 150, 156 (5th Cir.1988). The privity or knowledge for corporate owners is that of a managing agent, officer or

supervising employee. The burden of proof is on petitioners to prove lack of privity or knowledge. Pennzoil Producing Co. v. Offshore Exp., Inc. 943 F.2d 1465 C.A.5 (5th Cir. 1991 La.); *Admiralty and Maritime Law 3rd Edition*, Thomas Shoenbaum, § 13-6.

Ross Bruce was the president of the corporate owner and operator. He was also the managing agent that oversaw the operations of the vessel. He testified that this was the first time he was aware that the settee/bunk was used in seven to ten foot seas. He admitted that a company policy concerning the use of the settee/bunk was not put in place, preferring to rely on the judgement of the captain and crew as to when the settee/bunk could be used. As stated earlier, the negligence that claimant complains of is the captain and his crew's decision to allow passengers to use this settee bunk under the wind and sea conditions existing at the time of this incident, combined with the near full throttle speed of the vessel. This was an operational error. Under these circumstances the corporate owner may not have had privity or knowledge of the fault that caused this incident. This Court could find Gulf Tran, Inc. at fault but limit its liability to the $550,000.00 value of the vessel. Claimant would then proceed to recover his judgment from the surety in the event the judgment is not paid by Gulf Tran, Inc.

## MARITIME LIEN

If there is limitation then the lien issue is moot since the vessel owner has put up a bond to replace the vessel. In the event the Court finds that Gulf Tran is not entitled to limit its liability, then the bond may no longer be valid since there would not be a need for a limitation fund. Todd Hines would then be entitled to a maritime lien on the M/V SUPPLIER in the amount of the judgment.

Hines was injured by the negligence of the vessel's crew while a passenger on the vessel. The United States Supreme Court has recognized that a claim for personal injury suffered by a passenger on a vessel caused by the crew's negligence is a maritime tort with the right to a maritime lien. THE CITY OF PANAMA, 101 U.S. 453 (1879). In THE CITY OF PANAMA, supra, a passenger fell into a hatchway negligently left open by the crew of the ship. Justice Clifford speaking for the Court said:

> 'Injuries of the kind alleged give the party a claim for compensation, and the cause of action may be prosecuted by a libel in rem against the ship; **and the rule is universal that, if the libel is sustained, the decree may be enforced in rem, as in other cases where a maritime lien arises.** These principles are so well known, and so universally acknowledged, that argument in their support is unnecessary.' THE CITY OF PANAMA, 101 U.S. 453, 462. (1879) (emphasis added)

Claimant's right to a maritime lien against the M/V SUPPLIER based on personal injuries he received as a result of the vessel and crew's negligence is a maritime lien recognized by United States law. See, Thomas J. Schoenbaum, Admiralty and Maritime Law, (3d ed. 2001) 436-437.

The Commercial Instruments and Maritime Liens Act, 46 U.S.C.A. § 31301 (5) defines a preferred maritime lien as "a maritime lien for damages arising out of a maritime tort." Claimant's maritime lien arises out of a maritime tort that caused him personal injury. This gives him a preferred maritime lien on the M/V SUPPLIER.

## CONCLUSION

On December 24, 1998, at approximately 1:15 PM Todd Hines was lying on a settee/bunk on board the M/V SUPPLIER. The vessel was heading northeast toward Port Fourchon, Louisiana, traveling at a speed of about 9.5 knots. The seas were 7 to 10 feet striking the port bow of the vessel

causing it to pitch and roll severely. The wind was from the north at 30 knots. As the M/V SUPPLIER was crashing down from one of these waves the settee/bunk that Mr. Hines was lying on separated from the wall at its hinges causing Mr. Hines to fall to the floor of the salon area of the vessel.

The captain and crew were negligent in setting up the settee/bunk as a bunk for use by the passengers under the conditions faced by the vessel. The mate was also negligent in not reducing the speed of the vessel under those same conditions. As a result of that negligence, Todd Hines was injured. These injuries required neck and back surgeries that have caused permanent disability and have prevented him from returning to his usual occupation of an offshore construction worker. He has incurred medical expenses in the amount of $84,503.28. He is entitled to general damages in the amount of $275,000.00, past loss of earnings in the amount of $130,000.00, and loss of future earnings in the amount of $385,000.00. He is also entitled to recover legal interest from December 24, 1998, the date of this incident.

Respectfully submitted,

_____
Danny J. Lirette (Bar Roll #8619)
Dexter A. Gary (Bar Roll #21292)
LIRETTE, GARY & SPENCE, L.L.C.
10 Professional Drive
Post Office Box 2968
Houma, Louisiana 70361-2968
Telephone: (985) 876-2997
COUNSEL FOR CLAIMANT,
  TODD BALLARD HINES

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 6th day of January, 2003, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by mailing the same by United States mail, properly addressed and first class postage prepaid.

_____
Danny J. Lirette   -   #8619

## LIRETTE, GARY & SPENCE, L.L.C.
ATTORNEYS AT LAW

DANNY J. LIRETTE
DEXTER A. GARY
PHILIP A. SPENCE

January 6, 2003

RECEIVED
JAN 7 2003
U. S. DISTRICT JUDGE
MARY ANN VIAL LEMMON

**BY HAND**

Honorable Mary Ann Vial Lemmon
District Judge - Section S
United States District Court
Eastern District of Louisiana
500 Camp Street, C406
New Orleans, Louisiana 70130

  RE: In the Matter of the Complaint of Bruce Investment Co., Inc.,
    as the Owner of M/V SUPPLIER, and Gulf Tran, Inc.,
    as the Operator of M/V SUPPLIER, Praying for Exoneration
    from or Limitation of Liability Pursuant to 46 U.S.C. Section 183 *et seq.*
    USDC, Eastern District of Louisiana, C.A. No. 00-0372 "S" (2)

Dear Judge Lemmon:

  Enclosed you will find the original and one (1) copy of "Post Trial Memorandum" submitted on behalf of claimant, Todd Ballard Hines.

  With kind regards, I remain

              Sincerely,

              DANNY J. LIRETTE

eb
Enclosures

  cc: Mr. Fred E. Salley (w/enclosure)
     Mr. David K. Johnson (w/enclosure)
     Mr. Todd Ballard Hines (w/enclosure)
     Mr. Stephen R. Streete (w/enclosure)

10 PROFESSIONAL DRIVE • P.O. BOX 2968 • HOUMA, LOUISIANA 70361
TEL. (985) 876-2997 • FACSIMILE (985) 868-2310 • WEB SITE WWW.LIRETTEANDGARY.LAWOFFICE.COM