

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

'2003 JAN -7 PM 4: 07

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT | * | CIVIL ACTION |
| OF BRUCE INVESTMENT CO., INC., as the | * | NO. 00-0372 |
| Owner of M/V SUPPLIER, and GULF TRAN, INC., as the | * | 00 - 372 |
| Operator of M/V SUPPLIER , praying for | * | SEC. S(2) |
| Exoneration from or Limitation of Liability pursuant to | * | JUDGE LEMMON |
| 46 U.S.C. Secs. 183 *et seq.*. | * | MAG. WILKINSON |
| | * | |

**************************************************************************

## POST-TRIAL MEMORANDUM

**NOW INTO COURT COME PLAINTIFFS-IN-LIMITATION,** Bruce
Investment Co., Inc., and Gulf Tran, Inc., and submit the following memorandum on
certain basic issues before the Court in the captioned matter.

The Court has jurisdiction over this matter under the Admiralty and Maritime
Law of the United States, 28 U.S.C. § 1333, Suppmental Rules for Admiralty 9(h) and
specifically, the Limitation of Liability Act 46 USC § 183, *et. seq.*

A petition for limitation, alternatively for exoneration from liability, was filed by
Petitioners, Bruce Investment Co., Inc., and Gulf Tran, Inc., in February 2000. At the
time of the reported incident, the **M/V Supplier** was owned by Bruce Investment Co.,
Inc., but manned, provisioned, and crewed by Gulf Tran Inc., under an oral bareboat
charter( standard in the trade) making it the operator and owner *pro hac vice* under
Admiralty law. The filing followed receipt of a written notice of a claim from the
attorney for Todd Ballard Hines, claiming injury from an accident that was alleged to
have occurred on or about 24th December 1998 while Todd Hines was a passenger aboard
the untility vessel, **M/V Supplier.** The **M/V Supplier** was on a routine customer
(Allseas) dispatched trip from offshore near Ship Shoal Block 354 into the customer's



base located at Fourchon, LA. The trip was a routinely scheduled trip by Gulf Tran's customer for transport of garbage, equipment and other offshore materials. The vessel was also scheduled to back load material and supplies at the customer's base in Fourchon for delivery back offshore. Although platform personnel and contract workers were frequently transported by helicopter to the Ship Shoal field by Gulf Tran's customer, field vessels, including the **M/V Supplier** were ordered to transport personnel if the weather was too inclement for flying, or if there was insufficient helicopter transport available.

Several days before 24th December 1998, on 20th December 1998, the **M/V Supplier** had been ordered to transport Todd Hines, the supervisor of Omega Natchiq, and several other members of his crew, to the production platform at Ship Shoal 354 for connection of risers--piping and welding work--that was to be conducted there by several contractors including Omega. During the trip offshore, Todd Hines had argued with members of the vessel's crew.

Increasingly inclement weather conditions slowed Omega's work and prevented completion of the job that Todd Hines and his crew were dispatched to the platform to perform. In various meetings, conferences, and phone calls commencing on 23rd December, to which Gulf Tran was not a participant, the various contractors responsible for the piping work, decided that the Omega Natchiq (Todd Hines) portion of the contracted work, could not be performed for several days. (Rivers deposition) On Christmas Eve morning, Rivers contacted the **M/V Supplier** and advised Capt. Unrue that the Omega crew needed to ride the boat in. Unrue advised Rivers that weather conditions could make for an uncomfortable ride, but that the weather conditions were not severe enough to prevent loading or transportation of the passengers.

Unrue's practice was to estimate winds and seas for log recordation in the early morning. He had estimated sea conditions that morning as 6-9 feet. Winds were from the North gusting up to 25 knots. After backloading the Omega passengers, Unrue turned the vessel navigation over to Capt. Baxter, and proceeded to bed. He remained asleep in his cabin until after 1:00pm, when Rob Pittman woke him about the settee. Later, Unrue returned to his cabin and started his accident report documentation. He did not estimate sea conditions again until that evening when he estimated that the seas were between 7-10 feet. The wind was still from the North. (Unrue deposition)

On the morning of Christmas Eve, Monty Rivers, the White Wing Inspection supervisor (and Hines' immediate supervisor), told Todd Hines' that his crew would be sent in later that day because they could not perform their work. The weather was already overcast and rainy, and was expected by Hines and Rivers, to become worse with the passing of a cold front, not atypical for the season. Hines believed that the transport would be by helicopter, and told his crew to pack and get ready. Hines was then advised by Rivers that the transport would be by way of the **M/V Supplier** which was already standing by the platform, and scheduled to go into shore that day with other cargo. Hines and Monty Rivers had an argument over the fact that Hines' crew were only given a choice of making the long arduous trip in bad weather on a boat, or could hold over without pay on the platform through Christmas, or until the weather improved. Not surprisingly, Hines and his crew all wanted to go in on the boat, notwithstanding the bad weather; because none of them wanted to stay on the platform over Christmas. Monty Rivers eventually decided to stay, and finally went in by helicopter.

Christmas Eve morning around 9:00-10:00am, Todd Hines and his crew were loaded, with some difficulty, but no incidents, onto the **M/V Supplier** for the trip to Fourchon. Mr. Hines immediately complained about the conditions, even calling the platform and speaking with Monty Rivers, demanding that he and his men be brought back and returned to the Ship Shoal 354 platform, or dropped at another platform close by, and from there to be flown to shore by helicopter. At one time, he alleged that an Omega crew member was desperately ill, but no one in the crew was desperately ill, and the entire incident was apparently a ruse by Hines because he was upset, angry, and frustrated about not getting his way about flying in; or getting the captin to throw a vessel crewmember out of his bunk so that Hines could use it.

Flying was apparently never an option in any event, because the testimony indicated that helicopters could not safely fly in the existing weather. However, Rivers deemed that the weather was too rough to offload passengers back onto Ship Shoal 354 platform. Hines and Rivers heatedly argued about the matter, and in conversation with Captain Unrue, Rivers got the impression that Hines had threatened Unrue, but Hines finally accepted that his ride home would be by boat, together with the rest of his crew and the boat's crew.

Shortly after boarding, Hines had also argued with the **M/V Supplier's** captain, Vincent Unrue, demanding that he be provided with a crewmember's bunkroom; although it was clear from the testimony of Pittman, Baxter and Unrue, that there were more than enough bunks to accomodate all of the Omega crew, without use of the single fold-up settee located along the starboard bulkhead in the salon. Prior to the reported incident, Hines' behavior continued to be erratic. He kept coming up the stairs and

- 4 -

entering the wheelhouse, although he was repeatedly instructed to remain seated or lay down below. Even after his reported incident, he kept moving around the vessel, coming into the wheelhouse, and refusing to follow Unrue's and Baxter's instructions to stay below and sit or ly quietly.

Shortly after the crew were loaded and briefed on safety and other issues by Pitman and Unrue (Pitman and Unrue depositions) the vessel navigation was assumed by Capt. Baxter; and Capt. Unrue went into his bunkroom and went to sleep. Baxter charted a course due north to head the pointed bow of the vessel directly into the North winds, to improve ride and performance, and reduce rolling, pitching, or wallowing in the seas. It was her intent to proceed north until the vessel reached the coast where the course would be altered to the east directly to Fourchon. Baxter was the only eyewitness to actual sea conditions for this trip. Capt Unrue was in his cabin asleep. The Omega crew were inside the vessel and could not see the weather. They were not experienced observers in any event. Baxter thought the seas averaged around six feet, and the vessel proceeded without any severe roll or pitch. Baxter, in the wheelhouse, would have taken the brunt of any severe vessel movements (Compana testimony), but Baxter testified that the sea conditions for the vessel were moderate, as did Unrue and Pitman. During the several hours before the incident with Hines, Baxter made several trips down to the galley for the bathroom, and for drinks, having no difficulty whatever moving around the vessel. On one such trip, she observed an Omega employee inexplicably sleeping across the washer and dryer. Had the vessel been experienceig severe movement within the cabin, he could not have remained, asleep on these machines. Baxter denied that the vessel was wallowing in the seas, took any water over the bow, had prop cavitation, or sustained any

- 5 -

wheelhouse damage from breaking waves. The vessel's performance was good, and despite unsupported inferences to the contrary, used only a slight percentage of its fuel, and was still heavy with fuel during this trip in. The vessel was heavily fueled at the commencement of the job four days earlier, and had already made several round trips without appreciable percentage reduction of fuel stocks. According to Mr. Bruce, the **M/V Supplier** was capable of 10-11 knots in optimal conditions. Pitching, rolling, wallowing or prop cavitation all substantially rob prop and engine efficiency, and most noticeably, severely reduces measured speed over ground, The **M/V Supplier** was not encountering any of these problems as inferred from the unsupported assertions of Webster and Campana because, even from their own calculations, the vessel averaged about 9.5 knots for the trip. Therefore, Webster's and Campana's testimony was internally inconsistent and not credible as they could not allege both high speed and severe roll and pitch in side seas. Moreover, all of the vessel's crew testified that the sea conditions were moderate for the trip (Pitman, Baxter, and Unrue); and Baxter, the only actual eyewitness to the weather conditions on the inbound trip, categorically denied that the vessel was pitching, rolling, wallowing, or cavitating.

After sitting in the galley for quite some time, eating and talking, most of the Omega crew finally retired for the long boat ride in. One of Omega's employees elected to stretch out over the top of the washer and dryer, where he remained for the duration of the trip. The length of the trip, expected to be 7-8 hours, motivated the vessel crew to use extra consideration to let the Omega passengers find comfort how they could, and one of the crew let Eric Picard use his own bunkroom because Picard was feeling seasick. Only Hines and Sonnier remained active during much of the trip, and it is uncertain exactly

what they were doing in the salon and galley during most of the unwitnessed and unaccounted for, time. Neither was very clear at trial about their activities; and both were equivocal with respect to whether they were asleep or not asleep at any relevant time. Four to five hours into the voyage, Baxter went down for a break, and saw Hines sitting on a chair in the galley. When she asked him how he was doing, he told her he was not sure. She then noticed that the back of the vessel's single convertible (fold-up) settee was hanging from its straps. She went to inspect the situation, and found that the hinges holding the settee to the wall were not attached to the wall, but were still attached to the seat back. A number of screws were gathered into a small pile nearby. There were, surprisingly, no wood chips or splintering in the area where the back had been attached to the wall, and it appeared that some of the screws had simply been unscrewed from the holes. She called for Pittman to wake Capt. Unrue, so that she could return to the wheel.

Pittman woke up Capt Unrue, who had been asleep. He immediately went to inspect the broken bunk, carefully examined the remnants and spoke with Hines, Sonnier, and the other Omega passengers. His intital findings are best explained in his own words from his deposition which were admitted into evidence.

> "22    Q.  Did you look at the settee and the hinges
>
> 23          and condition after you spoke with Mr. Hines?
>
> 24    A.  Yes, I did.
>
> 25    Q.  Tell me what you saw.
>
> 37
>
> 1     A.  What I recall is that the screws that were
>
> 2    in the hinge, the ones that stayed in the hinge were

3    bent, like they were all bent in more or less the same

4    direction like as if that had been pried or pulled

5    from the aft, the part of the bunk attached to the

6    bulkhead that would be the farthest aft towards the

7    stern, okay.  Like if somebody had taken something and

8    put it in behind there or grabbed it and pulled it,

9    because they were all bent.  Do you understand what

10    I'm saying?  They were all angled forward, which would

11    have been toward the front of the boat.  Am I making

12    myself clear?  (Witness indicating.)

13        Q.  I don't know that I understand.  Do you need

14    a sheet of paper?

15        A.  Yes, I could draw it for you.  For instance

16    if this is the hinge here looking down at the top, the

17    screws would go in this way.  The screws were bent

18    like this, like this is the head.  Do you understand

19    what I'm saying here?  (Witness indicating.)

20        Q.  Okay, so it's like we're looking at a

21    bird's-eye view at the top of the hinge?

22        A.  Yes.  You're looking down at the top.  They

23    are bent.  There would be -- The bend shows that the

24    bunk pulled out this way, forward.  (Witness indicat-

25    ing.)

- 8 -

38

1          The other thing is, where the holes were in

2      the hinge, like this, once again, would be the same

3      position; now we're looking at the flat part of the

4      hinge.  You know how when metal is stressed it will

5      make a raised spot?

6      Q.  I'm not familiar with that.

7      A.   Okay.  Well, anyhow, like if the screw had

8      been in here, the metal, this was now elongated, this

9      hole, and the metal was bunched at this side here,

10     which would make me believe that the force applied

11     came from this direction to bend the hinge.  Do you

12     understand what I'm saying?  When it pulled out, the

13     screw would have been pulling with a pressure in this

14     direction is what I'm saying.  (Witness indicating.)

15     Q.   I'm, I'm still confused.

16          MR. SALLEY:  He's indicating laterally

17          rather than vertically.

18          THE WITNESS:  Right.  This is looking

19          down at it, and this would be where the hinge

20          screwed to the wall, okay.  In other words,

21          your slot for your screws would be right

22          here where you put the screwdriver in.

23    (Witness indicating.)

24    BY MR. LIRETTE:

25    Q.  Okay.

39

1    A.  All right.  These hinges showed that these

2    holes had been elongated like as if the force had come

3    this way and it had pulled out.  (Witness indicating.)

4         MR. SALLEY:  Again indicating laterally.

5         MR. LIRETTE:  Let the witness testify.

6         MR. SALLEY:  I'm simply stating for the

7    record.

8         MR. LIRETTE:  You'll have a chance to

9    question him.

10         MR. SALLEY:  Counsel, you know, you're

11    obviously not wanting to put on the record

12    what he's motioning for obvious reasons, so

13    I'm simply stating for the record what he's

14    motioning.  If the witness disagrees or if

15    Mr. Bolles disagrees or if you disagree,

16    you're free to put it on the record.

17    BY MR. LIRETTE:

18    Q.  You're talking about the force, instead of

19    being up and down, was going back and forth from front

- 10 -

20    to back?

21        A.  Forward to rear, front to back.

22        Q.  Okay.

23        A.  From back -- from what we would call aft,

24    meaning towards the back end of the boat.  This, let's

25    say this was the bow of the boat, that was the stern,

40

1    that bunk was on that wall.  (Witness indicating.)

2        Q.  Okay.

3        A.  And it looked to me like as if somebody had

4    taken some sort of force, either pried, pulled, what-

5    ever they did, and pulled that bunk from this end out.

6    In other words, whenever the bunk came off the wall,

7    it didn't go like it went "floom".  (Witness

8    indicating.)

9        Q.  Like it went straight down?

10        A.  Like it went like this.  (Witness indicat-

11    ing.)

12        Q.  Like the end that was closest to the back

13    came out first?

14        A.  Right.

15        Q.  So it was pulled away first?

16        A.  Right.

- 11 -

17    Q.   And the forward end was pulled away last?

18    A.   Right.

19    Q.   And what led you to believe that, the bend

20   of the screws?

21    A.   Because of the way the screws were bent and

22   because of the way the holes are elongated with the

23   amount of metal being, you know, like pushed up to

24   that corner of the screw hole.

25    Q.   So are you suggesting that someone had

41

1    pulled the bunk out?

2    A.   It appeared to me that that is what hap-

3   pened.

4    Q.   Did you ask anyone?

5    A.   Yes.

6    Q.   Who?

7    A.   I asked Mr. Hines what happened.

8    Q.   And what did he tell you?

9    A.   Mr. Hines told me that that bunk come

10   straight out from the wall and he fell down, striking

11   the edge of the bunk below him.

12    Q.   Okay.  Did you ask anyone other than

13   Mr. Hines?

14    A.  Yes, sir.

15    Q.  Who?

16    A.  The man laying on the bunk below him.

17    Q.  What did he tell you?

18    A.  Initially he told me he was asleep.  The

19  next thing he knew was Mr. Hines woke him up and the

20  bunk was hanging in his face.

21        What I want to explain to you is that there

22  is no way that Mr. Hines could have fallen out of that

23  bunk without landing on the guy below him, and the man

24  says he never felt anything hit him.  This is what he

25  told me initially:  He never felt anything hit him.

42

1  He never heard anything.  You know, that's what I

2  based my thoughts on.

3    Q.  You said the man said that initially, that

4  suggests to me that he said something different later

5  on.

6    A.  Never to me.  I'm saying initially when I

7  asked him.  I didn't, I didn't -- What I'm saying is

8  I didn't go back and ask him three or four times.  I

9  asked him one time and that was his answer.

10    Q.  Okay.

11      A.  And I don't recall what his name was or

12   anything, but I can remember talking to the man and

13   what he said.

14      Q.  You said initially Mr. Hines reported that

15   he was not hurt?

16      A.  Exactly.

17      Q.  Did that change?

18      A.  Not, not to me until he came back, after we

19   were at the dock, to me and wanted fill out an

20   accident report.  This is after he had been up, as far

21   as I know, he had been ashore and came back to the

22   vessel at that point."

**[Unrue Deposition Page 36, Line 22 through Page 42, Line 22]**

Richard Sonnier claimed to have been sleeping on the lower cushion of the indicated fold up settee, but he had not been awakened by the event, although Hines reported to Unrue (confirmed by the accident report and his trial testimony) that he had struck the cushion on which Sonnier was lying, as he fell.  Sonnier consistently denied anything hit the lower bunk where he was sleeping.  None of the vessel's crew, and none of eight other members of Hines' crew witnessed the accident.

The inner edge of the cushion support, attached by the shipbuilder with twelve wood screws through four hinges (Unrue deposition), was attached to the bulkhead to which it had been affixed by the original ship builder, when the vessel was built for the

original owner in 1981. (Unrue and Cass) Gulf Tran had purchased the used vessel known as the **M/V Wade B**, in 1994, from Daniel Bruce Marine Inc., for $275,000.00.

The fold-up settees had been in use aboard similar supply untility vessels from the late fifties (Cass testimony) and were an extremely common feature. Other vessels in Gulf Tran's operation also had similar bunks. The **M/V Leader**, Capt Baxter's regular boat, had three. None had ever given Gulf Tran any trouble, and none had ever pulled away from the wall at the hinges. Baxter spent several years working with her father who was a boat captain for Gulf Crews, Inc. His boat had similar fold up settees that were in continuous use. Baxter enjoyed using them on her father's boat, and also used frequently the settees on the **M/V Leader**. None had ever been a problem. They were constructed for use as an extra bunk, storage space, or settee, depending upon configuration, or desire. Although amply empowered to issue regulations for safety purposes, the Coast Guard had no criteria for their design or construction; limitations on their use; inspection or maintenance requirements; and they were not a part of any Coast Guard vessel inspection process. These bunks had been seen and used often by the Omega passengers, and by the vessel's crew.    Sonnier did not want to use the bunk, because it was uncomfortable, and he was afraid he would be thrown out, or that the nylon straps would break. (Sonnier testimony) No one, including the experts, had ever heard of any backs coming away from the wall attachments before this incident. The testimony indicated that this bunk had been in place and in use for about 15 yeears. No other company with similar bunks was reported to have **any limitations on their use as bunks**, and it is quite certain that had there been any companies with restrictions, or limitations, these would

have been found and reported by Hines' expert witnesses, Webster and Campana, who were both intense advocates of Hines' case.

Part of Webster's argument was that Gulf Tran should have been subject to shipbuilder association construction standards for construction of new vessels, although clearly, Gulf Tran was not a builder or designer of this vessel. Gulf Tran had never built or designed **any** vessel and was entitled to rely on the shipbuilder's expertise and skill. Apparently, that skill was pretty good, since the original bunk had been in place for 15 years without problems. Both Webster and Campana also tried to infer that Gulf Tran had an obligation to **dismantle** the bunk to inspect how it was attached to the wall, but this is way beyond any obligation owed of a vessel operator to a passenger under applicable law. In an apparent effort to bolster his argument, Webster had purchased a similar hinge and wanted to demonstrate that through-bolting of the hinges would be stronger, but in so doing inadvertently demonstrated the screws that the manufacturer supplied with the hinge, and **they were exactly the same size and design of those that Webster claimed were used by the shipbuilder for original attachment** of the back's hinges to the bulkhead, many years earlier. Also, there were no pre-incident indications of any problem with the attachment of the bunk. Rivers had slept on the bunk on the trip out, and it was stable (Rivers' deposition). Unrue, at 260 pounds, had climbed into the bunk to check it for useability just before the incident. He had found it stable, secure, and useable. Sonnier claimed to have climbed into the lower bunk just minutes or hours before the incident, at which time he had observed the condition of the hinges and screws where the back was screwed to the wall. He testified that the screws were all flush to the hinges meaning that the screws were tight; the hinges were all flush to the wall with no

wall with no sign of looseness or separation, and there were no signs of hinge gouging or rubbing on the adjacent wood panel, which might indicate that some screws were starting to work loose.

There was absolutely no evidence that anything was wrong with the attachment of the bunk to the wall. It conformed to the construction and attachment principles utilized by the shipbuilding industry for building and installing similar settees in similar vessels of similar age in the industry. Notwithstanding intense advocacy by Webster and Campana, the condition of this bunk gave no evidence of impending collapse, and it was inspected by the vessel's captain, Unrue, just before the alleged incident. No inspection, short of dismantling, could have disclosed anything out of order and nothing was out of order. Dismantling would have disclosed how the unit had been attached to the wall, but that would have been meaningless, because the facts clearly indicated that the bunk, and all similar ones were installed adequately by the constructing shipyards. The proof is in the many years of continuous, unrestricted use of not only the settee on the **M/V Supplier**, but on all other similar installations as well, with not a single known incident. The original builder could have likely devised a stronger attachment, but stronger is not mandated on the vessel operator, or the shipbuilder, if adequate is obtained. Three to four hinges with 9-12 wood screws had proven more than adequate attachment for many years, perhaps hundreds of years if the combined service life of all similar settees were considered. The vessel operator certainly has no notice of potential hazard to passengers in these statistics. Webster was challenged to provide the weight bearing capabilities of the existing installation, just to see how much force could have been exerted before failure, assuming use of three hinges and 9, 1' wood screws. Webster acted offended that

Gulf Tran would dare bother him with any facts, and in a rather condescending fashion, indicated that counsel was not smart enough to understand his opinions, and should simply accept them as true writs from some higher form of intelligence. Of course, the real answer was that Webster had not performed any calculations, checked the strength of any materials, or even attempted to calculate the forces needed to break the long surviving structure from the wall with the resultant damage to screws and hinges that Capt. Unrue copiously described in detail from his own first hand observations. Webster did not want to be bothered by any of these facts, because they directly contradicted his advocated opinion.

When Baxter and Unrue provided testimony in this case, neither were employees of Gulf Tran. They had no interest in the case—no reason to testify to any but honest recollection—no basis for bias, or concern that they had to testify in a certain fashion to ensure continued employment. Unrue laid out the facts of the incident line and verse, and his factual recollection is consistent with other testimony. There exists no discernible reasons to deny Baxter or Unrue credibility in this case. Mr. Lirette vigorously utilised all of his abundant skills as a trial lawyer seeking to discredit Capt. Baxter. This primarily involved asking her questions from her personal recollection, and then trying to use Capt. Unrue's logs to impeach her. Baxter did not prepare the logs on the **M/V Supplier** and never saw the vessel logs until more than two years after the accident. Hence, no valid impeachment lies in demonstrating a slight difference between someone else's recorded recollection and a witness' personal recollection after several years. Indeed, a simple comparison of the live testimony and the deposition testimony introduced into evidence in this case, proves mostly that the evidence is in great conflict

in all respects.  There was no bright line, no clear thread, and as much as there existed numerous contradictions on factual details between witnesses, there existed as many direct contradictions within the testimony of the individual witnesses.  The testimony of Sonnier, Pittman and Picard were so inherently contradictory as to question their value as witnesses on any single issue.  For example, Pittman was positive that the trip in occurred during hours of darkness.  He was adamant that Capt. Unrue was at the wheel and that he was there with the Captain.  Sonnier either could not or would not say whether he was asleep when the incident occurred.  He was clearly hostile and suspicious of Gulf Tran's cross and equivocal on many rather simple issues.  Picard's testimony indicated cross-pollination from Mr. Hines and/or his experts.  He also thought he had arrived in the salon shortly after the incident, but he apparently thinks that he saw four people in the vicinity of the collapsed bunk, makes no mention of seeing Capt. Baxter; but remembers arriving on the scene simultaneously with two vessel crew, apparently Pittman and Unrue, who arrived somewhat later by all other accounts.  Hines actually took the easy way out of supplying detailed facts.  His assertion that he was dazed (unsupported by Sonnier, Picard, Baxter, or Unrue) allowed him to dodge specific questions about what had occurred.  Dr. Culver would have an explanation for this ploy.  Hines did suggest a clear defense for the vessel.  He testified that just before the bunk pulled away, that there was an unusually large wave that caused the vessel to bottom out harder than before.  If this version is taken as true, Gulf Tran would not be negligent for unexpected intense sea conditions which were strong enough to break up the bunk.

Hines, and his retained experts, all have obvious interests in the outcome of this case.  To be untruthful for personal gain would be entirely consistent with Hines'

personality disorder and prior history. No other testimony contradicts the testimony offered by Baxter and Unrue as to the condition of the settee after the incident, or Baxter and Pittman's testimony that the sea conditions on the trip in to Fourchon were moderate for the vessel's activities. Gulf Tran is certainly not claiming that the seas were calm, but they were not excessively rough. The sea conditions would have seemed rough to the passengers inside, without creating any unusual difficulties or problems in getting around. Picard, Sonnier, and Hines repeatedly testified about several of their group sitting and eating in the galley, moving about the boat, and moving in and out of bunks. Picard noted a large group of individuals congregated in the salon near the bunk shortly after the accident, observing the scene. There was no mention in Picard's testimony about these persons having any difficulty maintaining their footing. Unrue, Pittman and Baxter likewise testified to similar instances of routine onboard movement from which the conclusion must be that the vessel was not heavily rolling, pitching, or wallowing at the time of the alleged bunk incident. Individual recollections to the contrary are apparently the result of interest in the case, bias, mis-impression, or suggestibility.

Although Mr. Hines had originally claimed that he had fallen over the outboard side of the cushion, both avoiding the holding straps set three to four feet apart, and defying the laws of gravity, he eventually changed this story in the trial, and claimed he fell within the straps and had hit the cushion below without striking Mr. Sonnier. He had then fallen onto the deck, landing on his right cheek, head and neck, receiving brusies to his cheek and breaking two teeth. He testified that he was dazed and had to be assisted to his feet, and to a chair in the galley. However, Sonnier did not support this view, and neither did Picard. Picard heard a noise and quickly came out of his borrowed bunkroom,

at which time he observed Hines holding the settee back to prevent it from swinging directly into the person (Sonnier) who was still lying on the lower bunk.

"6   Q.  All right.  Do you remember whether the individual that

7   was lying on the bunk, the bottom portion, whether that

8   individual was awake or asleep at the time you came --

9   A.  Oh, he was definitely awake.

10   Q.  By that time?

11   A.  Right.

12   Q.  Okay.  And was he still laying down?

13   A.  He was working his way out from under the bed when I got

14   out there.

15   Q.  And how -- he was having to do some kind of particular

16   maneuver to get out from under it?

17   A.  Yeah, more like roll out or, you know, slip out, duck

18   underneath the bunk that was hanging from above.

19   Q.  All right.  Now, when that bunk --

20        MR. SALLEY:  Strike that.

21   BY MR. SALLEY:

22   Q.  When you observed that bunk hanging down on the straps, --

23   A.  Uh-huh. (affirmative response)

24   Q.  -- how far off of the deck was it?

25   A.  Todd had his hand on one side of it, holding it up for

137

- 21 -

Picard - Cross

1    the other fellow to get out.  So, I'd say three or four feet

2    up.  I mean, I'm guessing.

3    Q.  All right.  Now, the very bottom edge, --

4    A.  Uh-huh. (affirmative response)

5    Q.  -- without Mr. Hines holding it up, would you have any

6    idea how far off of the floor it would swing?

7    **A.  It would have -- it would have hit the bunk below, and**

8    **then probably hung about the same level, maybe a foot, foot**

9    **and a half.**

10   **Q.  Now, had Mr. Hines not been holding it, it would have come**

11   **low enough to actually hit the bunk below, wouldn't it?**

12   **A.  Right.**

13   Q.  Now, it had a couple of inches added to it because the

14   hinges were pulled loose?

15   A.  Right."

**[Picard Testimony, Trs Page 136, Line 6 thru Page 138, Line 15]**

Unrue, Baxter, and Picard all indicated that the settee back would have definitely hit anyone on the lower bunk.  The measurements also indicated that the lower edge of the back, would have swept directly into anyone lying on the lower bunk, were the back to have come away from the wall as alleged by Hines.  It is also an almost absolute certainty that had Hines fallen between the wall and the holding straps, that he would have fallen directly on top of Sonnier.  The law of gravity would require this.  In

acknowledgement of the obvious problem, Hines claimed that he only brushed the edge of the lower cushion, which was so narrow, that Sonnier could not ly on his back without his body hanging over the outside. Even if this implausible story had any credibility, Sonnier still denied that anything hit him or the edge of his lower cushion. In a further effort to bolster the story, Webster came up with the heavy roll theory, which was just not supported by the facts in the record. Baxter denied that there was any severe roll, and the good average speed of the vessel totally contradicts the theory that the vessel was heavily rolling or pitching. Furthermore, Webster's roll theory suffers from the other inevitable law of nature that a pendulum, formed by the back hanging from the straps, upon reaching the maximum arc of swing in one direction, swings with equal force in the other direction. Even Sonnier saw that **he would have been hit by the lower edge and the hinges of the seat back**, if Hines had not been holding it and preventing it from swinging. (Sonnier and Picard testimony)

Further detracting from this incredible story is the incontrovertible fact that had Hines fallen on his face on the deck; and been so dazed that he required assistance to get up and reach a seat in the galley; he would not have been in place to hold the swinging settee back (clearly witnessed by Picard). Hines could not have reacted to have prevented it from swinging back into Sonnier; even if one assumes the rather highly unlikely story that the roll was severe enough to have permitted Hines to hit only the edge of the lower seat cushion. The final problem is a practical one. No one ever saw any bruises or abrasions to the right cheek, or heard any complaint from Hines about the two broken teeth—not even the emergency room personnel at Dauterive Hospital.

Hines initially claimed only minor injures and eschewed medical treatment, even when he arrived at dock. Immediately after the accident, Unrue observed Hines swinging his arms around and placing them over his head and shoulders. (Unrue deposition) After Unrue instructed a crewmember to help Hines, and his gear, off of the vessel at Fourchon, which assistance Hines categorically refused, Unrue observed Hines walk off the vessel with his gear, and manhandle it into the pickup sent there to pick him up. Hines showed no signs of injury or limited movement. It was only after Hines had left the vessel with his gear that Hines returned to the vessel and indicated to Unrue that he might be injured.

Rather than go directly to a hospital or seek any medical treatment, Hines went to the Inn of Iberia, where he commenced drinking on Christmas Eve. He did not seek any medical treatment at all until three days later when he went to the emergency room at the Dauterive Hospital on 27th December 1998. What he did, or the trouble that he got into, during those unaccounted for days between what he now claims caused serious back injury, cracked teeth, and bruises to the right cheek is anyone's guess, because Hines did not elucidate in any way. He certainly could have injured himself while drinking, or gotten into another argument that resulted in a tussle.

All in all, the circumstances surrounding the reported incident were extrememlly suspicious, and it appeared that the incident had been staged by Mr. Hines, perhaps with the help of Mr. Sonnier, who remained uncooperative and hostile toward Gulf Tran through the trial for unspecified reasons. The erratic behavior of Hines while on the vessel could not be accounted for by the vessel's crew. Initially, Hines refused to cooperate and sign the accident report, and it was only on threat of drug screening that Sonnier encouraged Hines to cooperate. It is also suspicious that someone now claiming

such extensive spinal injuries, could have or would have waited three days to see a doctor for initial treatment. Had Sonnier and Hines been using illegal drugs while aboard the vessel, and is this the reason that Sonnier was adamantly opposed to a urine test? Did Hines wait for three days hoping that drug levels in his urine would abate? Dr. Murphy certainly thought that Hines was a smart and sophisticated drug addict that had figured out how to avoid getting caught on most drug screens (Deposition of Dr. Murphy); although he was caught in a random screen and lost his job with Omega in June 1995. (Omega Corporate deposition) However, Hines was still smart enough and skilled enough that Omega rehired him on a fairly regular basis as its offshore supervisor for riser connections and other piping contracts.

Hines had many perceived motives to be mad at everyone, including the captain and crew of the vessel. Only a few weeks before Hines was assigned offshore to Ship Shoal 354 by Omega Natchiq, he had checked himself in at the Charter Cypress Hospital in Lafayette. Hines claims he went there for treatment of bi-polar disorder, long-term polysubstance addiction, inability to hold a job, irresponsibility, severe depression, and stated suicidal tendencies; all mental and physical disorders that had affected his mental and physical condition (and his work history) repeatedly for many years. He was discharged from Charter four or five days later before completion of treatment for **refusal to follow the rules** of the hospital; another serial trait of Mr. Hines.

As early as the late 80's in Houston, while earning a very good living as a real estate agent, Hines had started a downhill spiral into serious polysubstance addiction. These problems were enlarged by divorce, felony convictions, incarceration, and ever increasingly frequent and more severe social and psychiatric disorders, all as outlined as a

familiar pattern of substance abuse by Dr. Culver. Hines' problems were exacerbated by a true physiological disorder, finally diagnosed in late 1998 at Charter as bi-polar disorder. Drug addiction frequently accompanies this condition and tends to make substance addiction more difficult to treat. Bi-polar disorder also produces serious personality and social disorders in its own manifestation of symptoms, and can be treated, but not cured. Symptoms include depression and mania, although severe depression is more prevalent in persons with the disorder. According to Dr.Culver, both Bi-polar disorder and drug addiction can be seen to manifest in repeating cycles of greater or lesser symptomology. In addition to depression, sufferers are likely to react severly to perceived frustration, blame others for their own problems, be dishonst and deceitful, and make up stories to cover their own shortcomings or to obtain the goals of their drug seeking behavior. Hines was convicted of fraud and stealing in the early 90's in order to feed his drug habit. He was awaiting trial on a similar felony charge relating to honesty when he testified at his trial in December 2002.

Another manifestation of the longterm drug and behavioral problems typical of Hines condition which makes treatment so very difficult, is the attitude of the addictive person toward the treatment. According to Dr. Culver, only very longterm, programmed treatment, has any chance of curing persons such as Hines, but they only seek treatment when things really start going bad for them, then they promptly abandon treatment and refuse to commit to long term treatment. This response results in numerous, cyclical short term treatments which never do any good, and only provide short term respite from the pressures of outside conditions. Hines has exhibited this behavior over and over, both before and after the December 1998 incident. His infrequent and occasional visits to Dr.

Murphy do not indicate any serious commitment to treatment by Hines, only that he is window dressing his lawsuit in typical fashion. In fact, Dr. Murphy testified that he had not seen or heard from Hines for many months, but Hines suddenly showed up for a visit in mid-November 2002—two days before Dr. Murphy's deposition was to be taken for trial, and only three weeks before the trial started.

On release from jail for theft in the early 90's and while on probabtion, Hines pursued numerous jobs, having difficulty maintaining any of them, then started working offshore using pipefitting skills learned at his father's business as a youth. He eventually started working for Omega, and quickly worked up to supervisor because of his skills and intelligence. There seems little doubt that Mr. Hines could and would return to supervising for Omega Natchiq if the situation arose.

The testimony of Glen Hebert, called as a vocational expert by Hines, cannot be taken at face value, because it was woefully incorrect and based on a gross misunderstanding of the facts. In addition, Hebert artificially restriced his opinion to irrelevant constraints that are used only within the state's workmen's compensation system where he does much of his work, so he limits his review of available work and activities to a very small geographical radius. By further self-limitation, Hebert does not consider any employment located out of Louisana as potentially available, even where the subject has demonstrated an ability and history of relocation to other states for work. Hebert also testified that Hines was capable of performing real estate sales work, which he had prior experience doing; but Hebert said that as Hines had never made more than $2,000-$3,000 per annum doing it, he did not seriously consider it a suitable potential for Hines. Hebert was completely wrong. Hines' tax records clearly indicated that he made

more than $50,000 a year selling real estate in the late 80's in Houston, TX. Hines and his economist both admitted that his real estate earnings from the late 80's were greater than he had ever made offshore, or since. A return to real estate work would completely wipe away any future earnings loss, which in any case, Hines' economist factored at having been on average less than $35,000/yr offshore. In all events, Hines' greatest impediment in finding and keeping any employment of any type is and will remain his polysubstance abuse, refusal to commit to long term, intensive treatment, and bi-polar disorder, which did not originate on 24th December, and was not even changed in any way by whatever event, if any, occurred that day. His reported symptoms were the same when he checked back into Charter in early 1999, as they had been when he checked in and was promptly kicked out for rules violations in late 1998.

Dr. Bernauer did perform several back and neck surgeries for Hines months after the alleged incident. He frankly could not determine how or when he had sustained the injuries, or if they had been based on trauma. Dr. Cobb from Lafayette, who was seen by Hines only a couple of months later, might have been able to shed light on the causation issue, but Hines' elected not to call him, and one can only infer that his testimony would have been detrimental on the causation issue. These back and neck injuries could have commenced normally from aging, or have been sustained at any other time in Mr. Hines' tumultuous life. It was notable from Bernauer and Mayes, that both terminated care of Hines because illegal drug use was negatively impacting medical care and recovery. According to Dr. Mayes, Hines was not taking the useful drugs that he had prescribed, but was taking harmful, hard, illegal drugs, instead. On 29th September 2000, Hines tested positive for cocaine at the St. Patrick's hospital emergeecy room, then lied to Dr.

- 28 -

Mayes about the test. Both Bernauer and Mayes had serious concerns that Hines' unabated drug and substance abuse lifestyle was seriously delaying and marginalizing recovery from his recent back surgery.

Once Dr. Bernauer discharged Hines from his care, in late 2000, he apparently never returned to any orthopedic or neurologist for any further care or follow-up, clearly indicating that the surgeries were successful, and that Hines did not neeed further care for physical injuries. Dr. Bernauer only assigned minimal, rated disability for the surgeries, indicating that the results had been good. Hines could return to work at tolerance. In fact, Hines testified that he had been in school for retraining in computer networking for several months, and had been making "A's"

Literally hundreds of Universal hulls were built and used in the offshore oil industry, and many of the original vessels are still operating today. Gulf Tran still operates two or three. A common feature of the vessels, incorporated by the shipbuilders, was the fold-up settee. Gulf Tran had never had a single problem with any fold-up settees before Hines' alleged accident; and still operates one or more vessels with similar settees in use. There has been no history of any failures in the four years since the incident. (Bruce testimony) Gulf Tran had never heard of a bunk suddenly or unexpectedly pulling away from the bulkhead. (Bruce testimony) In all of the fact witnesses and experts, not one had ever heard of any problems or failures of the bunks. There was no industry history of any problems with these bunks failing or coming away from the attachments. Petitioners had no notice or knowledge of any potential problem with the attachment of the upper settee cushions to the bulkhead, and had absolutely no reason to suspect that there were any potential problems with the specific settee in this

case. Although an inspection of the fixment of the bunk was not legally required of petitioner's, any pre-accident inspection would have disclosed only that all of the screws were flush, tight, and firmly set into the marine ply of the bulkhead and cushion bottom, and that the bunk was stable and useable.. (Sonnier testimony, Unrue deposition)

The expert testimony from plaintiff's experts, Webster and Campana, is precisely the type testimony targeted for exclusion from consideration or admission by **Daubert *vs* Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579 (1993) and subsequent revisions to the Federal Rules of Evidence. The Court should disregard the testimony offered from these witnesses, as it was clearly intended to confuse; does not "assist the trier of fact;" and will not be helpful to understanding what happened. The "what" and the "why" in this case are beyond the expertise of either of these experts. Both experts were purely speculating on the occurrence of events that the testimony from the fact witnesses never supported. Moreover, their testimony was not supported by any documentary evidence or research. In order for their opinions to fly, they both had to create environmental conditions and fictional circumstances that were clearly and unequivocably contradicted by the eyewitnesses to the actual conditions. Finally, they could never exclude the very real likelihood of intentional tampering by Hines and/or Sonnier in this case; squarely and credibly presented by the carefully considered observations of Capt. Unrue and Capt. Baxter. (Unrue deposition, Baxter testimony) Neither of these witnesses owed any fealty to Gulf Tran in this case, but both clearly believed from their actual dealings with Sonnier and Hines, and their personal observations on the vessel, that Hines and Sonnier, were up to something. Whatever transpired on the boat may have started out as a mere prank, or vandalism, or just to "get back at the boat;" but it was turned into litigation by Hines

when he saw an opportunity for a free shot. It is clear that Hines was angry, frustrated and mad at events even before he left the platform for a boatride home. He expected a helicopter ride home on Christmas Eve, and he was not going to give in easily. (Rivers deposition, Hines testimony) Hines' actions and demeanor on the boat were entirely suspect, his reportage of the bunk failure equivocal; and he certainly showed no outward manifestations of someone who had just sustained multi-level back and neck injuries from falling on his head and neck hard enough to crack two teeth. Dr.Culver would likely counsel that one should deal with Hines' story using extreme caution, incredulity, and to look for pattern dishonesty for gain.

Hines was a non-paying passenger on the **M/V Supplier**. The vessel's only obligation to Mr. Hines, is completely controlled by the U. S. Supreme Court holding in **Kermarec vs. Compagnie Generale Transatlantique**, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed. 2d 550 (1959) which requires only the exercise of reasonble care under the circumstances of each case. Petitioners' were under no obligation to perform specific or decontructive inspections of gear or equipment for the benefit of Mr. Hines. Notification of known or reasonably discoverable hazards, not open and obvious to the passenger, is the most that would ever be required under the law. Unless there was some evidence of prior notice to Petitioners of a specific hazard, mere existence of a hidden hazard, if there were one, would not be actionable by Mr. Hines, **Perry vs. Morgan Guaranty Trust Co.**, 528 F.2d 1378 (5th Cir., 1976), even had he been a Jones Act seaman. Transitory conditions or events do not constitute negligence, or even unseaworthiness. **Garcia vs. Murphy Pacific Marine Salvage Co.**, 476 F.2d 303 (5th Cir., 1978). A passenger also has a duty to exercise reasonable care and precaution for his own protection, and to use

good judgment, including a request for assistance and information when necessary. **Ross vs. John E. Graham & Son, *et.al.*,** CA#95-2950, decided by this Court on 9th October 1998, affirmed by the Fifth Circuit in **Ross *vs.* John E. Graham & Son, *et.al.*,** CA#98-31364 on 22nd June 1999.

It seems ludicrous that Mr. Hines, an old hand at offshore employment (he was the supervisor for Omega) now claims that the vessel should have advised him that the vessel might encounter some rough weather. He already knew that and argued with Monty Rivers about coming in on the boat because of the weather. He made a deliberate adult's decision to come in, rather than stay out on the platform over Christmas, notwithstanding the possible bad weather. Just as incomprehensible, is his assertion that the crew should have advised him that using the upper settee during rough weather would be, well—rough. If he did not already know this simple fact, only ten seconds in that settee would have rather conclusively taught him about the laws of physics affecting a vessel in heavy seas. If the weather gets very rough, the ride would be as rough in the bunk as anywhere else on the vessel. He could have asked his mate, Sonnier, who had probably already told him it would be uncomfortable. If Hines did in fact use the upper bunk, the danger of being thrown out or bumped around in heavy weather was open and obvious, and required no warning. As to the bunk pulling away from the wall, if it did, Gulf Tran had no factual or legal reason to think that would ever occur, either. It never had, so there was no reasonable basis to issue a warning about something that had never occurred!

Although Hines commenced the trial arguing that 46 CFR 131.320 was applicable in some fashion, Hines expert Ron Campana eventually admitted the obvious fact that the

quoted CFR had nothing whatsoever to do with Mr. Hines alleged incident. Nothing more need be said about the cited CFR.

Hines never demonstrated any actionable negligence on the part of Gulf Tran, and certainly not on the part of Bruce Investment Co., so Hines' case should simply be dismissed for his failure to carry Hines' **required burden of proof of negligence**; which in this case would be failure of Gulf Tran to exercise reasonable care under the circumstances. Had Hines been in the bunk, he and/or the bunk would have inevitably struck Sonnier. He did not hit Sonnier, and the bunk never hit Sonnier at any time in any part of its expected swing. It is a confusing paradox, but one that Hines, not the Court, has to resolve in a logical fashion.

Although not its legal obligation, Gulf Tran has convincingly demonstrated that the separation of the bunk likely occurred from intentional tampering, relying upon facts not lightly dismissed, from a highly trained witness with no perceivable reason to be dishonest or biased. Hines' testimony may have inadvertently provided Gulf Tran with another legally valid reason for exoneration--that being his story that an unusually severe, unexpected sea condition, caused a heavy bottoming out which forcibly broke the bunk away. Hines and/or his bunk should still have hit Sonnier, however.

For their part, Gulf Tran, Inc. and Bruce Investment Co., clearly demonstrated their entitlement to not only limitation of liability, under the act, but to exoneration from liability as well. Accordingly, they request entry of the appropriate judgments in their favor.

Respectfully submitted

**FRED E. SALLEY, T.A. (#11665)**
**SALLEY & ASSOCIATES**
**P.O. Box 3549**
**Covington, LA 70434**
**Counsel for Plaintiffs,**
**Bruce Investment Co., Inc. and Gulf**
**Tran, Inc.**
**Tel (985)-867-8830**
**Fax (985)-867-8927**


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on all counsel of record by facsimile, delivery notification requested, and by placing same in the United States Postal Service, properly addressed and postage prepaid this 7th day of January 2003.

Fred E. Salley