UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT | * | CIVIL ACTION |
| OF BRUCE INVESTMENT CO., INC., as the | * | NO. 00-0372 |
| Owner of M/V SUPPLIER, and GULF TRAN, INC., as the | * | |
| Operator of M/V SUPPLIER , praying for | * | SEC. S(2) |
| Exoneration from or Limitation of Liability pursuant to | * | JUDGE LEMMON/WHYTE |
| 46 U.S.C. Secs. 183 *et seq.*. | * | MAG. WILKINSON |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SUPPLEMENTAL POST-TRIAL MEMORANDUM

**NOW INTO COURT COME PLAINTIFFS-IN-LIMITATION,** Bruce Investment Co., Inc., and Gulf Tran, Inc., and pursuant to this Court's recent order submits the following supplemental memorandum on certain basic limitation of liability issues before the Court.

I.

Not one had **ever** been known to fail, although dozens of similar strap up bunks had been incorporated into dozens of offshore service boats by shipbuilders since offshore oil exploration commenced in the fifties.  Forty years of continuous service without a single incident or failure is inherent proof of the safety and stability of the bunks; and the knowledge and expertise of the shipbuilders in the methods and materials used for attachment of the bunks within the dozens of similarly equipped vessels.  The cumulative record of safe useage is dozens if not hundreds of vessel years.

The Coast Guard, primarily responsible for regulating safety aboard ships, has never regulated the installation or use of these bunks; and has not through date, determined that they should come within annual inspections, or proposed regulations concerning their installation or use in new construction.

- 2 -

Not a single company was shown to have promulagated rules limiting or prohibiting the use of such bunks in any sea conditions, whatsoever.

This bunk was never shown to have given any indication of impending failure, although used by Monty Rivers for an extended time. It was inspected pre-voyage by Captain Unrue and found to be fit; and Sonnier, testified that he scrutinized the underside of the bunk and the method of its attachment to the bulkhead, and saw no indication whatsoever of any impending failure or looseness of attachment.

Gulf Tran could have dismantled the bunk from the wall, but had they done so, what would have been the findings? Gulf Tran would have only discovered that the bunk was tightly attached to the bulkhead with twelve screws in four hinges, exactly as it had been attached by the shipbuilder more than a dozen years previously. Was the mere boat operator, with no experience in shipbuilding or construction techniques, considering the unblemished record of service of this bunk, and the cumulative record of forty years without a single instance of failure of similar bunks, obliged to know more than, and substitute its judgment for that, of the shipbuilders, and conclude that the attachment was insufficient, as boldly asserted by the claimant through his experts? This would not be a conclusion supported by the law or the facts.

Claimants' experts were admittedly alone in their opinions about the "inherent" hazard of these bunks. No one else agreed with them, and had any other company, shipbuilder or government entitiy agreed with their purchased view, they, and claimant's counsel would certainly have left no stone unturned to present that testimony to the Court.

II.

The Court expressed surpise that Gulf Tran and Bruce Investment Company had spent much time in intitial briefing on the view that the accident was fabricated; and had not provided a detailed legal or factual analysis, or spent much time on the limitation issue. Responding to the last point first, Gulf Tran did not heavily brief the limitation legal or factual issues for two reasons. It has been customary in limitation cases for the District Court to first determine if fault exists, and the specific areas of the fault, after which the parties' additional briefing of "*privity* or knowledge" can be focused directly on the specific areas of fault identified by the Court. See generally, **Cenac Towing Co. vs. Terra Resources, Inc., 734 F.2d 251 (5th Cir., 1984)** and **In re Brasea, Inc., 583 F.2d 736 (5th Cir., 1978)**. After negligence of the vessel is established, the burden of proof showing lack of privity or knowledge then falls on the vessel owner. It must then also be determined by the Court which employees of the corporation are of sufficient corporate supervisory and management authority to charge with "*privity* or knowledge," of the demonstrated negligent acts, if any. **Continental Oil Co. vs. Bonanza Corp., 677 F.2d 455 (5th Cir., 1982)**

Moreover, in this case, counsel firmly believed that the testimony at trial, failed to exhibit that either petitioner in limitation was at fault in any way, entitling them to complete exoneration and dismissal of the claimant's libel. More will be addressed to these points further on.

Finally, there was never a doubt or dispute that the bunk either pulled away, or was pulled away from the bulkhead, where it had been firmly and safely attached for many years, with there being no sign of impending change in that staus in the moments

before the event, when Sonnier was carefully scrutinizing it from below, with the best view possible of its attachment points.

Gulf Tran has never suggested that it had any evidence that Hines was the sole perpetrator of a fabrication, or even that he was involved in one, but it is clear that this bunk, which had been firmly attached to that bulkhead for so many years, like dozens of others on many other boats, <u>was caused</u> to come loose for reasons other than heavy seas, since it cannot be assumed that the weather conditions prevailing on this particular trip had never prevailed before during the service life of this vessel. If so, that would be sufficient reason to dismiss Hines' claims, for "inevitable accident" or "act of God."

All events have a precipitating cause, and in this case, the only logical conclusion, and the only one that conforms to the actual evidence in the record, is that the bunk was intentionally tampered with, diminishing the strength built in by the shipbuilder, and allowing it to fail on this occasion.

Hines' experts proceeded with two theories, **but both** had to be wholly supported by the evidence to result in sufficient force to overcome the innate design strength of the bunk attachment as installed by the shipbuilder. **First**, Webster and Campagna had to assert that there had been excessive speed in heavy weather in order to claim that the vessel was subjected to heavy pounding in the seas; to **second**, support Webster' non-scientific opinion that the force of pitch and roll alone would have wrenched the bunk from the bulkhead. It was quite clear from these expert's testimony that mere speed in good sea conditions would not be enough, and that pitch and roll would not be enough. There had to be violent conditions in effect, or otherwise, the bunk would have failed in the same routine operating conditions in which the vessel had operated without any

problems with the bunk for many prior years, leading them also to the inevitable conclusion that there was intentional tampering.

Prior to trial, petitioners beseeched the Court to exclude the unsupported, unscientific, legal opinions and advocacy of experts Webster and Campagna, because they crossed the line from helpful expert opinion to pure advocacy. The Court declined to grant the motion, and permitted the experts, but as the testimony of this case was wrapping up in late December, Judge Zainey, in **Fanning vs. M/V Natchez**, USDC, EDLA CA#02-324 (19th December 2002) did exclude the testimony of Mr. Webster for the very reasons asserted by petitioners in this case.

The evidence just did not support the contention of Campagna and Webster that the vessel was subjected to intense pitching and rolling in heavy seas during the voyage in. Again, Campagna and Webster were completely alone in their view of excessive speed causing unusual pitch and roll. They were the only witnesses to make such a claim, and they were not along for the ride. To a man, or woman, the vessel crew denied that there was any intense pitch or roll at anytime during the voyage. The voyage in was made in normal sea conditions for the vessel. In fact, Webster and Campagna, refuted their own assertion. They calculated an average speed of almost ten knots, which is top speed for this vessel in **optimum sea conditions**. Intense pitch and roll would have significantly robbed the vessel of engine power (cavitation) and greatly slowed the vessel. Ten knots is not exactly blinding speed in any event.

Webster's second assertion, dependant on the Court's acceptance of the first—that the vessel was subjected to heavy pitch and roll from excessive speed—is as paper thin and specious as the first. Webster bluntly, and somewhat defiantly asserted, that

**assuming** a voyage with heavy pitch and roll, that it is **self-evident**, that there was enough force to wrench the bunk from the wall. It is not self-evident. Exactly why the Court is supposed to accept this unscientific, untested, and wholly speculative theory, which does not preclude other possible causes more consistent with the evidence actually in the record, is left to question, except that according to Webster, it is precisely because that was Webster's stated opinion.

Webster conceded that he could not determine the innate dynamic physical strength of the bunk installation, and had no idea what amount of force would have been required to overcome it. He did no math, calculations, studies, or other testing. Webster never saw the actual pieces involved in the failure, and made no effort to determine by engineering or mathematical examinations if the original shipbuilder's design and installation were appropriate. He never made any effort to contact the original shipbuilder for additional information. While the original shipbuilder's design and engineering work was backed up by many years of flawless operation without incident, Webster's contrary opinions were not supported by anything at all, except his blatant advocacy. His conclusions were speculation, piled on speculation, unworthy of any credibility whatsoever.

Even if one were to accept Webster's blatant, speculative assertions as to failure of the bunk in heavy pitch and roll, exactly what are the parameters to his charge of vessel fault. Was it his opinion that persons could, as intended, use the bunk in certain weather conditions, but not in conditions with winds of certain speed or direction, with seas of certain height or direction, and vessel speed of so many knots? What about when the vessel was tied to the dock at rest in calm seas? Was it Webster's opinion that the

bunk was obviously unsafe under any circumstances? If so, absolutely no one agrees with him, including the U.S. Coast Guard, except for perhaps Mr. Campagna; but they both accepted fees to pronounce the bunk unsafe under any circumstances. Perhaps their bought testimony is not very trustworthy. **Daubert *vs* Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)** Expert opinions that are theoretical, speculative, untested, unproven, based on nebulous assertions or "gut" feelings, and which cannot negate other possible theories, or causes of a particular event or phenomena, are simply no longer acceptable in the Courts of the United States.

Finally, in the quest to determine just why this particular bunk suddenly and unexpectedly failed after so long an unblemished record in service on this vessel, one would want to think that some useful information could be derived, even if inadvertently, from the claimant. Unfortunately, Mr. Hines provided no useful or credible information. He closely guarded his knowledge of the event, even claiming to have been so "dazed" that he had to be helped to a seat in the galley afterwards. This was a very important piece of testimony, in support of Hines "extensive injuries," but where was the eveidentiary support that he was dazed and had to be physically helped to a seat in the galley, during heavy pitcing and rolling of the vessel, no less? Sonnier did not help. Picard did not help. The crew did not help get him into the galley. Who helped him when he was so dazed, that he could not move without help. Where was the evidentiary support that after the accident, the vessel was intensely pitching and rolling?

At trial, Mr. Hines maintained good control of himself, and for a few hours appeared to be a perfect gentleman. One should not be taken in. For the preceding ten or fifteen years, Hines' criminal and medical records unambiguously portray him as a drug

addict and very bad actor with a long and violent criminal record. While acting charming on the witness stand, he was admittedly awaiting trial on a felony armed robbery charge.

For all of the above reasons, petitioners have remained convinced that they are entitled to exoneration in this matter, meaning that no detailed analysis of "*privity* or knowledge" was warranted.

### IV.

Agreeing with petitioners on nothing else, Hines' attorney stipulated that vessl valuation was $550,000.00. If the Court determines petitioners were at fault, the Court must then decide if petitioners were in *privity* or knowledge of the fault (in this case, negligence) determined to have been the cause in fact, as determined by the Court, of the accident. Referring to prior briefing, petitioners' liability to a passenger such as Mr. Hines, can only be based upon findings of regular negligence under **Kermerac**, since passengers enjoy no special relationship to a vessel to support more rigorous standards such as a warranty of seaworthiness, safe place to work, non-delegable duties, or other Jones Act type requirements. The standard is one of ordinary care. Therefore, in the initial briefing, petitioners cited a number of cases illustrating that the vessel owner was under no duty to discover hidden hazards or defects; to dismantle vessel gear or accoutrements in search of every potential hazard; or to warn a passenger of open and obvious hazards and conditions, such as wet decks, the vagaries of the seas, and that winds and seas can produce unpleasant, uncomfortable, bumpy, and perhaps nauseating boat rides. Likewise, even in Jones Act cases, the burden is upon the claimant to prove that certain hazardous conditions must have existed for a sufficient time, so as to fairly demonstrate that the vessel owner knew or should have known of the existence of a

hazard as in **Perry vs. Morgan Guaranty**. Finally, a boat owner is not obliged to substitute non-scientific, unaccepted, or minority theories in the place of accepted custom and useage in the industry, which has been enhanced by the logic of experience and/or greater technical knowledge.

As the Court had not yet announced any decision indicating that petitioners were at fault in any particular fashion that caused the Hines incident, petitioners can only assume that the bases would be the two pronged, but symbiotic attack, based on excessive speed and some innate defect in use of the bunk in unspecified circumstances.

As to speed of voyage, these petitioners are unequivocably entitled to limitation for what, if true, would be a classic instance of transient operational negligence carried out by a member of the crew whilst navigating. While not conceding that Captain Baxter did anything wrong, the con was entirely under her control, and she was exclusively in charge of the decisions effecting navigation on the trip inshore. Whenever and wherever she adjusted throttles and tiller on this trip, it was not within the *privity* or knowledge of the vessel management any place onshore. **Union Oil Co. *vs.* Dover, 756 F.2d 1223 (5th Cir., 1985)** As a practical matter, it was not until Hines submitted the expert reports of Campagna and Webster, three and one/half years after the fact, that any issues of excessive speed or alleged bad boat handling were asserted. Of course, speed could not have been a cause of the accident, because there simply was no credible evidence that the vessel was traveling at such an excessive speed as to have subjected the vessel to intense pitching or rolling, and no evidence of intense pitching or rolling. The crew, to a man, stated that the conditions of operation for the vessel were routine, and that they went

about their normal duties, or slept. The passenger on the washer and dryer slept through the trip too.

As to condemnation of the bunk by Webster and Campagna, Mr. Bruce was only the operator of the vessel which had been purchased used three years before the incident. He operated several other vessels with similar bunks. All were in normal use on all his vessels and all similar vessels. The vessel had passed through several Coast Guard inspections without problems or complaints related to the bunks. Mr. Bruce had never had, or even heard of anyone else in the industry, having a single failure, or impose any rules limiting or proscribing the use of the bunks. The shipbuilders were in a better position than he to evaluate the design and installation of such bunks, and their work had endured for many years. Mr. Bruce was entitled to rely on this broad base of knowledge and experience for his own operations. Dismantling the bunk to see how it was attached would have been foolish under the circumstances and would have produced no information that he could have evaluated; nor any that would have enlightened him to do anything more or different than that which had been done by the shipbuilder with obvious success. Mr. Bruce was not obliged by law or any legal duty owed to Hines for the exercise of ordinary care to undertake the dismantle of his vessel.

Mr. Bruce was also entitled to rely on the crew of the vessel while it was at sea, to perform routine visual inspections and checks in the exercise of ordinary care. This bunk was inspected for strength and suitability by Captain Unrue shortly before Hines boarded. It was further scrutinised very carefully by Mr. Sonnier, who denied the existence of any apparent observable defects in its attachment. Therefore, there was evidence that the bunk was examined, and found to be in good order; and that there was nothing to be seen

or known by the vessel owner. If the examination of the bunk by the crew prior to the departure from the platform was defective because the crew were careless or inattentive, the vessel's owners and operators could not have been in *privity* or knowledge of this fault, and would be entitled to limitation.

*Privity* or knowledge, as used in the limitation statute refers to complicity of managerial levels in whatever fault caused the particular casualty. **In re Complaint of Mac Towing, 670 F.2d 543 (5th Cir., 1982)** Errors in navigation or operation of the vessel by the crew while the vessel is at sea impose no liability on the owner or operator. **Union Oil Co. *vs.* Dover, 756 F.2d 1223 (5th Cir., 1985).** It is the exception for an owner to be denied limitation because of the negligent acts of a non-managerial employee. Managerial officers are defined as those to whom a corporation or business has committed general management or general superintendance of the whole or particular part of its business, but this does not include the Captain or the crew, or the language and intent of the Act would be vitiated. **Waterman Steamship Corporation, *et. al. vs.* U.S., 414 F.2d 724 (9th Cir., 1969).** Both owners and operators are entitled to limit under the Act. The Supreme Court has ordered a broad construction of the Act to achieve Congress' purpose in its passage. **Calkins *vs.* Graham, 667 F.2d 1292 (9th Cir., 1982).** Within appropriate bounds, the protection of limitation should extend to everyone whose relationship to the vessl might make him liable for injuries that occur on the vessel. **Calkins,** *supra*.

As covered at the commencement, this brief is somewhat limited because counsel cannot accurately predict, what if any, specific facts in the record might support findings of fault by the Court against the vessel in this case. Certainly, counsel has lived with this

case for four years, and has carefully reviewed the evidence, and is convinced that there simply was no proof that the vessel was guilty of any ordingary negligence against which the "accident" could be attributed. The symbiotic theories of excessive speed subjecting the vessel to intense pithing and roling, crucial for making the bald assertion that these events created enough, but unknown and uncalculated, force to wrench the bunk from the wall after more than a dozen years with the vessel in similar service and sea conditions, was not supported in the record and strains logical credulity. Since, as the Court pointed out to Mr. Hines, this case was "all or nothing" he had to make a stretch to impose liability, and Hines' "experts" aggressively pursued this purpose, but without credibility in doing so. This case is "all or nothing" for the uninsured petitioners as well, but their position has been grounded firmly in the actual record of the case, rather than a fictional scenario created out of fantasy, but stated with adversarial zeal. The cause of the failure most consistent with the record, is that the bunk was intentionally tampered with, or levered from the wall. Petitioners have no evidence as to the identity of the perpetrators, but stil believe one or more of the passengers may have been involved. In any event, the record does not support actionable negligence under **Kermerac,** so with limitation inextricably tied to fault, lack of fault would entitle petitioners to exoneration. The channels of fault asserted by Hines, if accepted by the Court, would clearly entitle petitioners to limitation under the Act, because any negligence woud have been restricted to vessel crew while at sea, without privity or knowledge of petitioners' management. Accordingly, petitioners respectfully request that the Court dismiss the claims of Mr. Hines, or alternatively grant petitioners limitation of liability under the Limitation Act.

Respectfully Submitted:

_____
FRED E. SALLEY, T.A. (#11665)
SALLEY & ASSOCIATES
P.O. Box 3549
Covington, LA 70434
Counsel for Plaintiffs,
Bruce Investment Co., Inc. and Gulf Tran, Inc.
Tel (985)-867-8830
Fax (985)-867-8927

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on all counsel of record by facsimile, delivery notification requested, and by placing same in the United States Postal Service, properly addressed and postage prepaid this 17th day of March 2003.

_____
Fred E. Salley