

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF BRUCE INVESTMENT CO., INC., as the Owner of M/V SUPPLIER, and GULF TRAN, INC., as the Operator of M/V SUPPLIER, praying for Exoneration from or Limitation of Liability pursuant to 46 U.S.C. § 183 *et seq.* | CIVIL ACTION<br><br>NO: 00-0372<br><br>SECTION: "S" (2) |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Facts and procedural history**

On December 20, 1998, Todd Ballard Hines, as foreman, and his six-man crew were transported from Port Fourchon, Louisiana, to a production platform near Ship Shoal Block 354 aboard the M/V SUPPLIER, a 106 foot offshore supply vessel. The M/V SUPPLIER was owned by Bruce Investment Co., Inc. (Bruce Investment) and manned, provisioned and crewed by Gulf Tran, Inc. (Gulf Tran) under an oral bareboat charter. Hines was assigned by his employer, Omega Services Industries, Inc. (Omega) to supervise piping and welding work for Allseas, Inc. After arriving on the

DATE OF ENTRY
APR 1 4 2003

platform, the Omega crew was unable to perform any work due to inclement weather. On December 24, 1998, it was decided that the Omega crew and other contractors would return to Port Fourchon. Although Hines requested that he and his crew be transported in by helicopter, the options given to Hines and his crew were to make the trip on the M/V SUPPLIER, despite their knowledge of the discomfort of the eight or nine-hour trip, or to remain on the platform without pay for Christmas. Monty Rivers, the Allseas representative, made the arrangements for them to be transported aboard the M/V SUPPLIER.

Captain Vincent Unrue was at the controls as the nine passengers boarded the vessel. He oversaw the boarding and determined that, although the weather conditions would make the ride uncomfortable, it was safe to make the voyage to shore. When the vessel left the platform at 9:15 a.m., Rene Teresa Baxter, the first mate, took the wheel, and Unrue retired to his bunk room behind the wheelhouse.[1] The vessel log for December 24, 1999, indicates that the skies were cloudy, the wind was blowing 35 knots in a northerly direction, and the seas were recorded at six to nine feet in the morning and seven to ten feet in the evening. The passengers found it difficult to move around the vessel, and several experienced seasickness. Unrue noted in

---

[1] Robin Pittman, the deckhand, testified that Unrue was at the controls when the accident happened. This is discredited by testimony of both Unrue and Baxter.

2

his report that the weather was "bad."

A settee bunk was located midship on the starboard side in the salon area of the vessel. The upholstered back formed an upper bunk when it was pulled out at the bottom and attached with two nylon straps to padeyes on the ceiling. Two or three hours into the trip, Hines became nauseated and climbed into the upper bunk to attempt to rest. Richard Sonnier, a sandblaster for TNT, Inc., was trying to sleep in the bunk directly below. Hines was not able to sleep soundly because he was being bounced around by the movement of the vessel in the rough seas.

At approximately 1:15 p.m., the screws securing the hinges on the upper bunk suddenly pulled away from the wall, and Hines fell to the floor on his right side, hitting his back, head, shoulders, and the right side of his face. Sonnier did not see the upper bunk separate from the wall, but he heard a noise and turned to see the bunk swinging from its straps close to his face with the 3/4 to one-inch screws still sticking out of the hinges. Hines got up from the floor dazed and sat in a chair in the galley, not knowing whether he was injured.

When Baxter responded to the accident, Hines was sitting in the galley, and the bunk was hanging vertically and swinging from the nylon straps.[2] Robin Pittman, the deckhand, woke Unrue and

---

[2] The bunk was not available at trial because it was apparently removed from the vessel. It was not preserved as evidence. No one admitted knowing where it is.

reported that Hines had fallen. Unrue filled out an accident report, which Hines signed at some point during the voyage.[3] Unrue describes the accident as being caused by "structural failure caused by heavy weather damage." Unrue also prepared a Coast Guard report after the vessel arrived at Port Fourchon.

The night the vessel came into port, Hines went to New Iberia, Louisiana, and got a room at the Inn of Iberia. The next day, he felt sore and could not get out of bed. Hines called the Omega office and asked for help in getting to the hospital. On December 27, 1998, Hines went to Dauterive Hospital in New Iberia with complaints about his neck and back pain and cracked or broken teeth.

Bruce Investment and Gulf Tran filed a complaint for exoneration from or limitation of liability pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims, and 46 U.S.C. § 183 *et seq.* Hines filed a claim for damages, asserting that he was injured as a result of the negligence of the owner and operator of the vessel. The Louisiana Workers' Compensation Corporation intervened to recover the full amount of benefits and medical expenses paid to Hines.[4] The case proceeded

---

[3] Unrue's report does not mention any dispute with Hines.

[4] Hines challenges the Louisiana Workers' Compensation Corporation's right to recover out of monies he may receive in this litigation. He alleges that the policy of insurance issued

to trial before the court on December 9, 2002.

**Exoneration**

In order to exonerate the owner from liability, the owner, his vessel, and the crew must be shown to have been free from fault. See Tittle v. Aldacosta, 544 F.2d 752, 755 (5th Cir. 1977). It is a settled principle of maritime law that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." Kermarec v. Compagnie Generale Transatlantique, 79 S.Ct. 406, 410 (1959).

The defendants argue that, when Unrue examined the screws and hinges after they came out of the wall, "it looked . . . as if somebody had taken some sort of force, either pried, pulled, whatever they did, and pulled that bunk from this end out." The defendants suggest that this evidence, along with evidence of Hines's discontent with being on the vessel, indicates the accident was staged. The defendants argue that Hines could not have fallen out of the top bunk without landing on the passenger below him.

---

by the Louisiana Workers' Compensation Corporation contains a waiver of subrogation clause that prohibits it from recovering any amounts paid by any of the parties to this litigation. Following the court's decision, memoranda shall be submitted on this issue. The parties will stipulate as to the amount of the intervenor's claim.

The defendants' expert witness was totally discredited at trial, and was unable to support this theory because he did not have access to the bunk. The expert admitted that the validity of his calculations of the trajectory of the falling bunk was dependent on the length of the straps and that the information was not available to him. He conceded that, if the straps were shorter, Hines would have bypassed the person on the bottom bunk as he was thrown to the floor.

Based on the evidence presented at trial, Hines's demeanor during his testimony and on cross-examination, and Unrue's initial report that the accident was caused by "structural failure caused by heavy weather damage," the court rejects the allegation that Hines "staged" the incident. The accident occurred when the screws securing the upper bunk pulled away from the wall, and Hines was thrown to the floor.

Unrue stated that there was no policy concerning the passengers' use of the settee bunk for resting or sleeping. Although Coast Guard safety regulations include a policy that passengers remain seated for the duration of a voyage during rough weather,[5] Pittman stated that the rule was basically disregarded for the comfort of the passengers. Pittman testified that, generally, he assumed the responsibility to "let the

---

[5] A placard containing that information was placed aboard the vessel.

passengers know the do's and don'ts of what they can and cannot do on the vessel." On the day of the accident, Pittman removed one contractor from the upper bunk and instructed all within hearing that they could not sleep in the upper bunk because it was not safe. Pittman did not remember instructing Hines personally about the safety of the bunk and could not say whether Hines heard his announcement. Plaintiff's expert witness, Ronald Campana, also testified that the upper bunk should not have been used while the vessel was underway and that a simple safety orientation and advisory to the passengers to remain seated during rough weather at sea would have averted the accident.

The evidence further establishes that, even though the seas were extremely rough on the day of the voyage, Baxter operated the vessel at almost full-throttle speed of 9.5 knots in seven to ten-foot seas. Campana opined that the excessive fuel consumption indicates that the vessel was traveling too fast under the weather conditions. Campana testified that the combination of pitching, pounding, and rolling caused a "corkscrewing" effect. He stated that a more experienced captain could have controlled the effect by changing the speed and the course. Hines's expert witness, Geoffrey Webster, testified that, under those conditions, the vessel would have been bouncing bow to stern, pounding up and down, and rolling port to starboard. In his opinion, the severe bouncing caused the

7

downward vector force that pulled the 3/4 to one inch screws from the wall.

In view of the evidence, the court finds that the accident was caused by the negligent operation of the vessel at high speed in rough seas, and that the screws securing the upper bunk were not adequate to hold a passenger in the upper bunk safely under those conditions. Because steps were not taken to provide for the passengers' safety during rough weather, the owner and operator of the M/V SUPPLIER breached the duty of reasonable care owed to Hines as a passenger on the vessel. Accordingly, Bruce Investment and Gulf Tran are not entitled to exoneration from liability on Hines's claim of negligence. The question becomes whether Bruce Investment and Gulf Tran are entitled to limit their liability.

**Limitation of liability**

"The Limited Liability Act allows a vessel owner to limit its liability for any loss or injury caused by the vessel to the value of the vessel and its freight." In re Hellenic Inc., 252 F.3d 391, 394 (5th Cir. 2001). "Under the Act, a party is entitled to limitation only if it is `without privity of knowledge' of the cause of the loss." Brunet v. United Gas Pipeline Co., 15 F.3d 500, 504 (5th Cir. 1994). If the shipowner is a corporation, "knowledge is judged by what the corporation's managing agents knew or should have known with respect to the

conditions or actions likely to cause the loss." Id. "Once the claimant establishes negligence or unseaworthiness, the burden shifts to the owner of the vessel to prove that negligence was not within the owner's privity or knowledge." In re Hellenic, 252 F.3d at 394; 46 U.S.C. § 183(a).

"[P]rivity or knowledge is imputed to the corporation when the employee is an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." Id. (internal quotation and citation omitted). "[H]owever, the limited liability doctrine is also sensitive to the scope of an owner's control over his agents." Id. at 396. "Thus, a master's navigational errors at sea are generally not attributable to the owner. When the owner is so far removed from the vessel that he can exert no control over the master's conduct, he should not be held to the master's negligence. In such cases, the owner may rely on the master's skill and expertise." Id. "[W]here the master is at sea, far from the owner's control, limited liability is more desirable." Id.; but see Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365 (5th Cir. 1983) (en banc) (vessel captain was more than master whose negligence at sea traditionally does not deprive shipowners of the right to limited liability; he was a managing agent for the owner and was in near-complete control over maritime field operations).

9

Ross Bruce is the owner and president of Bruce Investment and Gulf Tran and makes all decisions about the operation of both companies. He testified that he operated several vessels with similar bunks and was not aware of a failure of any of the bunks on his vessels. Moreover, no evidence was presented at trial that anyone with management responsibility for Bruce Investment or Gulf Tran had any knowledge that the bunk was unsafe prior to the accident. Unrue, who weighs 260 pounds, testified that he tested the bunk shortly before the passengers came aboard the vessel, and there was no indication that it was shaky or loose.

Pittman gave contrary testimony that the bunk presented a danger of injury and that he favored cutting the straps of the upper bunk so that it could not be used. He considered it to be unsafe in rough seas and "knew" that there was a good chance that a passenger could be thrown to the floor and injured. Pittman stated that it was common knowledge on the vessel that there were not enough screws to hold the upper bunk. However, he had not inspected the manner in which the bunk was attached and could not articulate a basis for his opinion, other than an unnamed crew member had told him. Pittman was not aware of any prior incident in which someone had fallen from the bunk, and he did not recall that anyone had ever informed the owner or bareboat charterer that there was a problem.

The defendants argue that Baxter "was exclusively in charge

10

of the decisions [a]ffecting navigation on the trip inshore," and her decisions were not within the privity or knowledge of the shipowner corporation or its management. Hines did not provide evidence at trial that Bruce, as the executive officer, or any managing agent of Bruce Investment or Gulf Tran knew or should have known that the vessel was operated at excessive speed under the circumstances or that provisions for the passengers's safety in light of the weather conditions were not made. The shipowner corporation was far removed from the vessel and Unrue'e decision, as the master of the vessel, to entrust Baxter to navigate the vessel in inclement weather, and was entitled to rely on Unrue's skill and expertise.

Accordingly, the court finds that the shipowner corporation did not exert control over the negligent operation of the vessel on this voyage and that Bruce did not know of the conditions or actions that caused Hines's injury. Therefore, errors on the part of Unrue and Baxter are not attributable to the shipowner corporation, and Bruce Investment and Gulf Tran are entitled to limit their liability to the value of the vessel.

**Medical History and injury**

Dr. Dale Bernauer, an orthopedic surgeon, saw Hines on March 3, 1999, for complaints of neck pain, right arm pain, numbness in both hands, back pain, right leg pain, and numbness in the right foot. Dr. Bernauer conducted a physical exam and found that the

symptoms were consistent with a herniated disc in Hines's neck and back. An MRI of the lumbar spine showed a herniated disc at L4-5, an MRI of the cervical spine showed a herniation at C5-6 and C6-7, and an EMG showed L5 nerve root compression and carpal tunnel syndrome. A subsequent myelogram revealed an extra dural defect at C4-5, C6-7, and L4-5. A CAT scan following the myelogram showed a stenosis and bulge at C4-5, C5-6, and C6-7 and a protrusion at L4-5. The symptoms and findings were consistent with an accident such as Hines described.

Dr. Bernauer referred Hines to Dr. Joseph O'Donnel, a general surgeon, who recommended a retroperitoneal exposure and lumbar interbody fusion. Hines underwent lumbar surgery at Lake Charles Memorial Hospital on August 19, 1999. Because Hines continued to have problems with his neck, he underwent surgery for an anterior cervical diskectomy and fusion on February 1, 2001.

A functional capacity evaluation conducted on June 12, 2001, indicates that Hines has a 25% permanent disability to his lower back and a 25% permanent disability to his neck. The disability results in a 10% permanent disability to the body as a whole. Hines is limited to sedentary work, which requires lifting no more than 10 to 20 pounds and does not require stooping

squatting, bending, or climbing.[6]

Dr. Bernaurer referred Hines to Dr. Paul E. Mayes, a pain management and rehabilitation specialist, for an initial visit on June 27, 2000. Hines had undergone a decompressive lumbar laminectomy at L4 and L5. As a result of a failed pedicle screw fixation, Hines was experiencing axial or radicular pain. Dr. Bernauer asked Dr. Mayes to evaluate whether further surgery could redress Hines's pain. Dr. Mayes prescribed a time-released analgesic, a narcotic analgesic (oxycontin), and an agent for neuropathic pain (hydrocodone). After two weeks, Dr. Mayes determined that Hines was managing his pain with the medication and prescribed a routine of low impact exercises. In August, Hines complained of side effects from oxycontin, and Dr. Mayes prescribed methadone. In September, Hines reported that he was in excessive pain and required more medication than Dr. Mayes had prescribed. Dr. Mayes became concerned about the quantity of Hines's medication and consulted with Dr. Charles Murphy, III.

Dr. Charles Murphy, III, a board certified psychiatrist, had begun treating Hines on November 30, 1999, when he was admitted to the Behavioral Health Unit of St. Patrick's Hospital because of problems with drugs and depression. Hines had a history of drug and alcohol problems, and he suffered a relapse as a result

---

[6] The medical bills for surgery in the amount of $84,503.28 were paid by the Louisiana Workers' Compensation Corporation.

13

of losing control of the drugs used to manage his pain after the injury. He underwent inpatient treatment for approximately four days and was released. Dr. Murphy continued to treat Hines sporadically through 2002. The treatment plan was a combination of medication management and dynamic oriented psychotherapy. Dr. Murphy prescribed Xanax and Klonopin, which are anti-anxiety drugs. Dr. Murphy considered Hines to be disabled from a psychiatric standpoint and unable to work. He diagnosed Hines with major depression and poly-substance abuse and considered the possibility of bipolar disorder.

On September 29, 2001, Hines went to the emergency room at St. Patrick's Hospital, complaining of acute pain. The drug screen was negative for the medications prescribed by Dr. Mayes or Dr. Murphy, indicating that Hines had not taken any prescribed medication for 48 hours before the test. Dr. Mayes set rigid guidelines for Hines and declined to treat him unless he was treated for substance abuse.

**Damages**

There are no probative facts introduced by the defense from which the court could conclude that no award is due to Hines. He established through documentary medical evidence, the deposition testimony of his physicians, and the trial testimony of Glenn Hebert, a vocational expert, that he has a disability that precludes him from performing his past oilfield construction

work. In addition to the physical restrictions, Hebert testified that Hines's problems with addiction and depression will affect his ability to work. Hebert stated that the offshore work, which he is no longer able to perform, was good for Hines because it is a controlled environment without drugs,[7] and Hines could earn between $40,000 and $50,000 if he had not been injured.

The amount of damages for loss of past and future wages is speculative and cannot be calculated with mathematical exactitude. See Wilson v. Aetna Casualty & Surety Co., 401 So.2d 500 (La. Ct. App. 1981) (quoting Folse v. Fakouri, 371 So.2d 1120, 1122 (La. 1979)). To establish the amount of damages sustained because of loss of past and future earnings, Hines presented the testimony of an economist, Randy Rice. Rice evaluated Hines's past lost earnings and his future loss of earnings for a work life expectancy of 20.9 years. Rice used two alternative evaluations based on different wage bases. First, Rice calculated that, if Hines's earnings of $46,956 during the fifty-two-week period prior to the accident is used, his past lost after tax earnings from the date of the accident to the date of trial would be $151,269 and his future potential after tax earnings would be $643,627. Assuming that Hines is not permanently disabled and is not retrained, he would be able to

---

[7] Hines objects to the defendants' reference to an alleged criminal charge in a post-trial memorandum. The objection to the reference is granted.

earn an average of $6.58 per hour, and his future lost earnings would be $441,705. If Hines is retrained, he would have the potential to earn $12 per hour or $24,960 per annum, and his future lost earnings would be $331,772. Alternatively, Rice calculated the losses based on Hines's average earnings of $33,363.13 per year during the five years before the accident. His after-tax past lost earnings under this calculation are $113,316, and the future lost earnings are $268,178 if he is not retrained and $158,245 if he is retrained.

The court accepts Rice's testimony and finds that the applicable wage base is Hines's actual earnings for the fifty-two weeks prior to the accident; therefore, Hines's past lost earnings from the time of the accident to the time of trial is $151,269. The court further finds that Hines is a young, educated man with varied work experience and that he has the ability to retrain and achieve an earning capacity of $12 per hour as long as he adheres to a substance abuse program. See Folse, 371 So.2d at 1124 ("[D]amages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity."). Therefore, his future lost earnings are $331,772.

In addition, the court finds that Hines is entitled to an award of $275,000 in general damages, $84,503.28 in medical

expenses, and legal interest from December 24, 1998.

**Conclusion**

Accordingly, the court finds that Hines injured his back and neck when the screws that attached the upper bunk pulled from the wall and Hines was thrown from the upper bunk. His injury was caused by the negligent operation of the vessel at near maximum speed in rough weather conditions and by permitting passengers to use the upper bunk under those conditions. As a result of the negligence and resulting injury, the court finds that Hines is entitled to a total award of $842,544.28 plus legal interest from December 24, 1998. The court also finds that Bruce Investment and Gulf Tran are entitled to limit their liability to $550,000, the stipulated value of the vessel.

NEW ORLEANS, LOUISIANA, THIS _14_ DAY OF April, 2003.

MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE